Argued and submitted February 12, affirmed September 16, 1992, reconsideration denied February 10, petition for review denied March 23, 1993 (315 Or 644)

# STATE OF OREGON,
*Respondent,*

*v.*

# MORRIS DALE KOLBE,
*Appellant.*

(C88-10-38124; CA A60984)

838 P2d 612

David B. Kuhns, Salem, argued the cause for appellant. On the brief was Morris Dale Kolbe, *pro se*, Salem.

Jonathan H. Fussner, Salem, argued the cause for respondent. With him on the brief were Charles S. Crookham, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Before Buttler, Presiding Judge, and Rossman and De Muniz, Judges.

De MUNIZ, J.

## De MUNIZ, J.

■ A jury convicted defendant of aggravated murder, ORS 163.095, and he appeals. We view the evidence in the light most favorable to the state, *State v. McDonnell*, 313 Or 478, 480, 837 P2d 941 (1992), and affirm.

Defendant owned an insurance agency. Over the years, he branched out into other enterprises. He started a jewelry business, sublet office space to a diamond dealer and began selling "small amounts" of cocaine out of his office.

O'Kelley began working for defendant as an insurance agent around 1985. According to defendant, he was very good. He paid attention to detail and took good care of his clients. O'Kelley also bought and sold computers on a daily basis. After working for defendant for three years, O'Kelley "wanted to get out [and] open his own shop." At the time, he owed defendant five thousand dollars. On February 15, 1988, police officers found O'Kelley's body in a sleeping bag in the back of his pickup truck. He had been shot.

Defendant testified that he had been out to dinner with friends on the night of the murder and knew nothing about it. Mullen told a different story. He testified that he met defendant in 1985, when he accompanied a friend to make a drug purchase at defendant's office. He started selling stolen property to defendant for cocaine and money on a regular basis. After a year and a half, he began selling cocaine for defendant. He also began selling stolen computers and other electronic equipment to O'Kelley.

One day, defendant asked Mullen to kill O'Kelley. Defendant suggested that Mullen lure O'Kelley to Mullen's house by telling him that he had some computers for sale. Mullen agreed and told defendant that he needed money to get his wife and children away from the house. According to Mullen, "he wanted me to lure [O'Kelley] over to my house, and he would pay me for it." Defendant delivered a gun, bullets, money and drugs to Mullen at his house. Mullen did not pay for the drugs. He took his family to a motel. The next morning, he left the motel and called defendant to confirm their plan. Mullen and his brother-in-law, Baxter, went to Mullen's house. Mullen called O'Kelley and invited him to come over to buy some computers. He testified that he lured

O'Kelley to his house so that he could "[keep] getting high and keep getting dope coming in." After O'Kelley arrived, Mullen told him that he could not get the computers, because the police were watching the house. O'Kelley left.

Mullen called defendant and told him, "I couldn't do it to him. * * * I couldn't kill [O'Kelley]." Defendant responded, "Call him back and set it up again. * * * [T]ell him to come back over, and we'll take care of it." Mullen talked to O'Kelley again and told him that the computers were now available. O'Kelley returned to Mullen's house. Mullen told him that Baxter would return momentarily with the computers. They waited in the kitchen. Suddenly, the back door burst open. Defendant and a man that defendant called Mark appeared with guns. O'Kelley began pleading for his life, but defendant said he "didn't want to hear it." Mark grabbed O'Kelley by the coat and threw him into the bedroom. Defendant laughed as O'Kelley continued pleading. Mark looked at defendant, defendant nodded, and Mark shot O'Kelley three times in the chest. Mullen started to flee, but he stopped when defendant grabbed his shoulder and told him not to go anywhere.

Defendant gave Mullen the keys to O'Kelley's truck and told him to drive it somewhere. Mullen took it to his sister's house, and defendant followed. Defendant asked Mullen to get the body, put it in the truck and get rid of it. Mullen asked to be paid. Defendant gave him $1,000, some cocaine and instructions for getting rid of the body. After "partying" on cocaine and heroin, Mullen went back to his house and found the sleeping bag with O'Kelley's body in it. He put the bag in the truck, drove away and abandoned the truck.

A grand jury indicted defendant for aggravated murder, ORS 163.095, alleging that he

"did unlawfully and intentionally solicit and pay and agree to pay another person money, drugs and other things of value to unlawfully and intentionally cause the death of another human being, to-wit: Robert John O'Kelley, and pursuant thereto the said other person did unlawfully and intentionally cause the death of Robert John O'Kelley[.]"

In his first two assignments of error, defendant contends that the trial court erred when it denied his motion for

judgment of acquittal. First, he contends that the evidence cannot support an aggravated murder conviction, because defendant hired Mullen to kill the victim, but Mullen was not the person who actually killed him. He also argues that the conviction cannot stand on Mullen's uncorroborated testimony, because he was an accomplice.

ORS 163.095 provides, in part:

" '[A]ggravated murder' means murder as defined in ORS 163.115 which is committed under, or accompanied by, any of the following circumstances:

"* * * * *

"(1)(b) The defendant solicited another to commit the murder and paid or agreed to pay the person money or other thing of value for committing the murder."

Mullen testified that defendant offered to pay him to lure O'Kelley over to his house and kill him. Defendant gave Mullen drugs and money. Unquestionably, the drugs and money had value to Mullen. The jury could reasonably conclude that defendant gave them to Mullen as consideration for murdering O'Kelley.

Initially, Mullen was supposed to shoot O'Kelley, but he testified that he could not bring himself to do it. However, Mullen's tergiversation does not relieve defendant from liability for aggravated murder. Defendant solicited Mullen to commit the murder and compensated him with money and drugs.[1] At defendant's request, Mullen lured O'Kelley back to the house so that defendant could kill him or have someone else do it. Although Mullen did not personally kill the victim, he committed murder by luring O'Kelley to his house for the execution. ORS 161.155(2); *State v. Hull*, 286 Or 511, 515-16, 595 P2d 1240 (1979). Defendant cannot evade responsibility for aggravated murder simply because his paid accomplice could not pull the trigger.

■■ Because Mullen was an accomplice, his testimony alone cannot support a conviction. The testimony of an accomplice must be "corroborated by other evidence that tends to connect the defendant with the commission of the offense." ORS 136.440. Corroboration, whether direct or

---

[1] There was no evidence that defendant paid Mark to commit the murder.

circumstantial, is sufficient "if there is some evidence, however slight, tending to connect the defendant with the crime." *State v. Walton*, 311 Or 223, 242, 809 P2d 81 (1991) (quoting *State v. Caldwell*, 241 Or 355, 361, 405 P2d 847 (1965)).

■ Mullen testified that defendant brought him a gun in a paper bag. Baxter and his wife testified that they were at Mullen's house the day before the murder when defendant brought Mullen a paper bag. After defendant left, Mullen had cocaine, which he shared with Baxter and his wife. He also had at least two hundred dollars in cash, which he gave to his daughters. Detective Hill testified that she searched Mullen's house and found a paper bag containing eight .38 caliber hollow point bullets, the same type as the ones that were removed from O'Kelley's body. Hill also testified that she found defendant's business card at Mullen's house, and it had defendant's pager number written on it. Mullen's testimony was sufficiently corroborated by other evidence that connected defendant to the murder.

■ Next, defendant claims that the court erred when it denied his motion for a mistrial. Mullen testified on direct examination about a telephone conversation that he had with defendant in early 1987:

"Q. What precisely was it that [defendant] mentioned to you about [O'Kelley]?

"A. Okay. Before — If I can speak. Before this happened, before he — about [O'Kelley, he] had asked me about killing some guy out in St. Johns."

Defendant objected and the court immediately stated, "I'll strike that." After another 40 pages of testimony by Mullen, the court recessed. During that recess, defendant moved for a mistrial. His motion came "after the incident [was] allowed to pass by." *State v. Shafer*, 222 Or 230, 235, 351 P2d 941 (1960). That was too late. The court did not abuse its discretion by denying it. *State v. Walton, supra*, 311 Or at 248; *State v. Melton*, 112 Or App 648, 649, 829 P2d 1053, *rev den* 314 Or 176 (1992).

■ Defendant also claims that the court erred by admitting evidence of his prior bad acts,[2] but his brief does not

---

[2] OEC 404(3) provides:

"Evidence of other crimes, wrongs or acts is not admissible to prove the

properly set out the pertinent verbatim portions of the record that relate to the specific rulings that he challenges. We decline to search the record in an attempt to find support for his arguments. ORAP 5.45(4); *City of Portland v. Paulson*, 98 Or App 328, 330 n 1, 779 P2d 188 (1989).

■ The court instructed the jury:

"There's a depiction of liberty in the statue where justice is blindfolded and holding a scale. People refer to that often-times indicating it means justice is blind. Justice is blind in one sense. It's not that justice is ignorant, because we do expect justice to be the truth, but justice is blind in the sense that when the evidence goes into the scales, justice is not looking to see which way the scales balance.

"Justice is blind in the sense that justice is willing to put the evidence in the trays and let the evidence balance out, and then without attempting to influence that decision, without lifting the blindfold to see which way it's going in raising or lowering one of the trays, justice is willing to accept the outcome of what the balance dictates.

"And that's really what you have to do in deciding this case as jurors."

Defendant took an exception to that instruction, on the ground that it might have misled the jury into believing that it could find defendant guilty by a preponderance of the evidence. Defendant might be correct, if that instruction were the only guidance that the court gave the jury on weighing the evidence.

However, the court also gave the jury this instruction:

"In weighing the evidence in this case, you start with the presumption that the defendant is innocent, and this pre-sumption of innocence follows the defendant unless and until guilt is proven beyond a reasonable doubt.

"The burden is upon the state to prove the guilt of the defendant beyond a reasonable doubt. The burden never shifts to the defense.

character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

"A reasonable doubt means an honest uncertainty as to the guilt of the defendant. Reasonable doubt exists when, after careful and impartial consideration of all of evidence in the case, you do not feel convinced to a moral certainty that the defendant is guilty. Proof beyond a reasonable doubt is such as you would be willing to act upon in the most important of your own affairs."

Viewed as a whole, the instructions informed the jury that a guilty verdict requires proof beyond a reasonable doubt. *State v. Williams*, 313 Or 19, 34-42, 828 P2d 1006 (1992); *State v. Brown*, 310 Or 347, 356, 800 P2d 259 (1990).

Defendant's remaining assignments of error are either without merit or are not properly presented.

Affirmed.