Argued and submitted April 8, affirmed July 13, petition for review denied
September 20, 1994 (320 Or 131)

## STATE OF OREGON,
*Respondent,*

*v.*

## JANICE KAY GRAHAM,
*Appellant.*

### (C930133CR; CA A80783)

877 P2d 1225

Charles D. Burt argued the cause for appellant. With him on the brief was Burt, Swanson, Lathen, Alexander, McCann & Smith, P.C.

Thomas H. Denney, Assistant Attorney General, argued the cause for respondent. With him on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Before Rossman, Presiding Judge, and De Muniz and Leeson, Judges.

De MUNIZ, J.

**De MUNIZ, J.**

Defendant and Ford, her long-time domestic partner, were each indicted for kidnapping in the first degree, ORS 163.235; menacing, ORS 163.190; and pointing a firearm at another, ORS 166.190. After a joint trial, defendant and Ford were each convicted of kidnapping in the first degree and menacing. Defendant appeals.

Because a jury convicted defendant, we view the evidence in the light most favorable to the state. *State v. Kolbe*, 115 Or App 268, 270, 838 P2d 612 (1992), *rev den* 315 Or 644 (1993). The victim, a Northwest Natural Gas employee, visited defendant's and Ford's residence to read the gas meter. On a second occasion, the victim, along with another employee, visited defendant's residence to replace the meter. Thereafter, Ford telephoned Northwest Natural Gas and asked that the victim return his call. Instead, the victim drove to defendant's residence.

When defendant answered the door, Ford was standing behind her. Defendant and Ford invited the victim to enter. After the victim entered, Ford asked defendant, "Is this the guy?" Defendant answered, "Yeah, this is the guy." Ford said, "Let's go in the bedroom, I want to talk to you in there. I don't want the kids to hear." Defendant led and Ford followed the victim into the bedroom. Once inside, Ford told the victim to close the door.

The victim stood near the door while defendant sat at the edge of the bed. Ford, sitting at the far side of the bed, pointed a revolver at the victim and said, "You've been fucking [defendant]." The victim replied, "No. No, I haven't, I've never touched her. You know, you must have the wrong guy." Ford then asked defendant, "[A]re you sure this is the guy?" Defendant nodded affirmatively and said "Yeah." Ford then asked defendant, "[W]hy don't you tell him what you told me?" Defendant turned to the victim and said, "You fucked me and treated me with no respect." The victim continued to deny the accusations.

Referring to the employee who had accompanied the victim during the victim's second visit to defendant's house, Ford said, "If I ever see that macho man around here again,

I'll blow his head off." Ford then retrieved a different hand-gun, a .44 magnum, and said, "This one will blow you right through the wall." Within Ford's reach were displayed a semi-automatic rifle, similar to an M-16, and a 9 mm auto-matic. When the victim grabbed defendant and held her between himself and Ford, defendant chuckled, "Sure, use me as a shield." When the victim looked at the door, Ford pointed the cocked revolver at the victim and said, "Don't even think about that door." After the victim protested, Ford warned, "Shut up or I'll fucking kill you right now." Ford again asked defendant whether the victim had had sexual relations with her, and she again nodded her head. About 30 minutes later, when defendant walked over to Ford and stood between Ford and the victim, the victim successfully fled from the house.

Ford was taken into custody soon after the incident. At the police station, Officer Parks conducted a 30-minute, tape-recorded interview with Ford.[1]

---

[1] Ford told the police, in part:

"They [referring to the victim and his associate during their previous visit] go out by the van and the smaller guy is talking to the bigger guy, the bigger guy acts like he's humping, you know, and shit like that. I said, honey, do you know what the hell is going on with those people, I mean, I've never seen gas people act like this. She says, I don't know, that one guy he just acts so weird. . . .

"* * * * *

"and because of that and because he was never reported to the police or anything this guy thinks he has the right to come back and do it anytime, he feels like he's got the rights to just. . .today when he came, he didn't come up, he opens the damn screen door * * * starts pushing the door open and I was walking out of the bedroom at that time and I said, hold on there bud, who the hell do you think you are? Are you [Ford], did you call? I says yes, who are you? Oh, I'm with the gas company. I says, okay fella, I think we got something we need to talk about here. Come on in here cause my baby just got home from school. . . .

"* * * * *

"and uh, I went and closed the bedroom door and I says, uh, [defendant] told me something has gone on but I don't want to deal with it, I don't want to talk about it. And I says, then I will. I said, fella, if you got any damn brains you're going to tell me what the hell happened. I said, I don't know if you know this or not, but a public company like that, I don't think they're going to be real impressed to find out that one of their employees is messing with people on his meter routes. Whether it be through consent or not. . . .

"* * * * *

"and to tell you something, you guys ever come back to my property again and act like you did out there in front I'll cost you both your jobs. And she knows, as far as I'm concerned she has. . . . take a look around here partner, right there, you can see what looks like an automatic rifle, like an M16 with lots and lots of

ammunition in it, like an R15 semi-action. * * * [I]t's got the heavy duty extended barrel * * *.

"* * * * *

"Yeah and I pulled. . . . there was a .44 magnum, and I showed that one to him and I said, man if she hit you with this sucker. . . and I DID NOT, (laughs) I didn't point it at him, okay?

"* * * * *

"I did have it in my hand, but I told him, I said she'll defend herself. He says, lady tell the man I didn't do anything to you did I? She looks over and she says, Yes. * * * I said, okay fella why don't you talk about what you did. She * * * was standing beside me * * *. I had already pointed out the fact that there was sufficient guns around there for her to protect herself. * * *

"* * * * *

"* * * I said, if she shoots you with son of a bitch she'll put you through the wall, buddy, do you understand that? You fuck with her and she won't have to, I'll do it. . . .

"* * * * *

"* * * I'm already [sic] to kick his ass, but [defendant] came over to me, she says honey I think he understands. About that time he did a mad dash for the fuckin' door. * * * But, he kept saying, I didn't do nothing, I swear to God * * *. [Defendant] just looked at him and said, yes you did.

"* * * * *

"I told him if he messed with my lady I'll. . . . yeah, I'll defend her, you bet I will, and I told him. . . .

"* * * * *

"I told him he better leave her ALONE. Because if she didn't enforce it I would.

"* * * * *

"I would kick his ass.

"That's when I told him the .44 magnum, even in a little doll's hands like that would put his ass through the wall. He better leave her [alone] * * *.

"* * * * *

"* * * [T]he first time I ever saw her look a man in the eye and say YES!!!, right to his face. He says lady I didn't mess with you. * * *

"* * * * *

"He was right across the room.

"* * * * *

"Oh, 15-20 feet.

"* * * * *

"I would imagine looking at the guns in that room, he might have thought I would pick any one up could have blown him away. * * *

"* * * * *

"* * * No, the point of the gun was to demonstrate, you ever see, I mean a .44 magnum looks very threatening, okay. Which was the point of holding the damn thing up. Even a little girl like her holding with both hands, you would only have to take one shot, you know, if she connected, he wouldn't bother her no more. The point was to let him know that she has, if I don't happen to be here, she still has protection * * *."

Over defendant's objection, the court granted the state's pretrial motion to consolidate defendant's and Ford's cases for trial. Ford did not testify at the consolidated trial, but his tape-recorded statement was admitted into evidence.

■ Defendant first assigns error to the court's decision to consolidate the cases and to admit Ford's statement. She argues that the admission of Ford's statement at the consolidated trial violated her confrontation rights under the state and federal constitutions.[2] We analyze the confrontation question, because the consolidation in this case would be impermissible only if the admission of Ford's statement was reversible error.[3] *See State v. Quintero*, 110 Or App 247, 252 n 6, 823 P2d 981 (1991), *mod* 114 Or App 142, 834 P2d 496, *rev den* 314 Or 292 (1992); *State v. Taylor*, 125 Or App 636, 866 P2d 504 (1994).

In *Bruton v. United States*, 391 US 123, 88 S Ct 1620, 20 L Ed 2d 476 (1968), the Supreme Court held that, in order to protect a jointly tried defendant's right to confront his or her accusers, a non-testifying codefendant's hearsay confession that facially implicates the defendant cannot be admitted. Here, the trial court accepted the state's argument that defendant's confrontation rights were not implicated by the admission of Ford's statement, because the statement was "not a confession." The state continues to advance that argument on appeal and also contends that, even if Ford's statement should not have been admitted, defendant's own trial testimony, in which she implicated herself in the events

---

[2] The Sixth Amendment to the United States Constitution provides:

"In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him."

Article I, section 11, of the Oregon Constitution provides:

"In all criminal prosecutions, the accused shall have the right * * * to meet the witnesses face-to-face * * *."

Defendant makes no confrontation argument under Article I, section 11, of the Oregon Constitution and no assertion that the result would be different under the Oregon Constitution. Therefore, we decide the case under the federal constitution.

[3] ORS 136.060(1) provides:

"Jointly charged defendants shall be tried jointly unless the court concludes before trial that it is clearly inappropriate to do so and orders that a defendant be tried separately. In reaching its conclusion the court shall strongly consider the victim's interest in a joint trial."

described by Ford in his statement, renders any error harmless. Because we agree with the state's second point, we assume, and do not decide, that a trier of fact could find that Ford's statement did inculpate defendant in the commission of the crimes.

In *Cruz v. New York*, 481 US 186, 188, 107 S Ct 1714, 95 L Ed 2d 162 (1987), the Supreme Court held that the confrontation clause is violated by the admission of a co-defendant's confession in a joint trial, even if the defendant's own confession has been introduced. The Court also noted that a defendant's confession "may be considered on appeal in assessing whether any Confrontation Clause violation was harmless." 481 US at 194. Accordingly, even assuming that Ford's statement should not have been admitted, we see no reason why we may not consider defendant's trial testimony in determining whether the admission of Ford's statement was harmless error.

The issue at trial was whether the incident at defendant's residence was the volatile, dangerous and threatening event described by the victim, or the more benign encounter described by defendant in her trial testimony and by Ford in his pretrial statement to the police. Defendant's testimony at trial, although often unclear and unresponsive, was entirely consistent with Ford's pretrial statement. She admitted to being present in the room with Ford and the victim, admitted that Ford had handled various guns while accusing the victim of sexually assaulting her and admitted that she had confirmed Ford's allegation that the victim had sexually assaulted her. Defendant denied that Ford was armed when the victim was escorted to the bedroom and that Ford had pointed a gun directly at the victim. Nothing in Ford's pretrial statement directly or inferentially implicated defendant to any greater degree than her own trial testimony. In short, defendant and Ford presented a united defense.

We have reviewed the record and have compared defendant's trial testimony with Ford's pretrial statement. We conclude that defendant was not prejudiced in any significant way by the introduction of Ford's statement and that there is little likelihood, if any, that the admission of Ford's statement affected the verdict in defendant's case. Assuming

that it was error to admit Ford's statement, the error was harmless.

■     Defendant also assigns error to the denial of her motion for judgment of acquittal. She argues that, at most, the state proved only that she was present during the commission of the crimes and that mere presence is insufficient to support a conviction based on aiding and abetting. However, a reasonable trier of fact could conclude that defendant encouraged the detention and menacing of the victim when, in response to the victim's plea that she inform Ford that he had done nothing to her, she instead confirmed to Ford that the victim had, indeed, sexually assaulted her. The trial court correctly denied defendant's motion for judgment of acquittal.

Affirmed.