Argued and submitted September 23, affirmed November 30, 1996, petition for review denied March 18, 1997 (325 Or 80)

# STATE OF OREGON,
*Respondent,*

*v.*

# LARRY EARL GIBSON,
*Appellant.*

## (94CR-0891FE; CA A88754)

928 P2d 344

David E. Groom, Deputy Public Defender, argued the cause for appellant. With him on the brief was Sally L. Avera, Public Defender.

Kaye E. Sunderland, Assistant Attorney General, argued the cause for respondent. With her on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

EDMONDS, J.

## EDMONDS, J.

The state charged defendant with intentional murder and murder by abuse, ORS 163.115,[1] after the disappearance of his young son, Tommy. The jury returned a verdict of guilty on the lesser-included offense of manslaughter in the second degree, ORS 163.125,[2] from which defendant appeals. He assigns error to the denial of his motion for judgment of acquittal, to the admission of evidence of uncharged misconduct and to the exclusion of evidence that he offered. We affirm.

Tommy Gibson, defendant's two-year, eight-month-old son, disappeared from defendant's rural Douglas County home in March 1991. A comprehensive search of the area surrounding Tommy's home failed to reveal any trace of Tommy. Shortly after beginning the search, police began investigating the possibility that Tommy had disappeared as a result of foul play. Police targeted defendant as the primary suspect of their criminal investigation. Despite a criminal investigation lasting over three years, police never found Tommy's body or any physical evidence pointing to the cause of his disappearance or death. About one year after Tommy's disappearance, defendant, Tommy's mother and Tommy's sister, Karen, moved to Montana. In Montana, Tommy's mother gave birth to Lisa in 1992. Police arrested defendant in April 1994 and charged him with the murder of Tommy. Defendant pled not guilty, and the case went to trial.

---

[1] ORS 163.115(1) provides, in part:

"Except as provided in ORS 163.118 [manslaughter in the first degree] and 163.125 [manslaughter in the second degree], criminal homicide constitutes murder:

"(a) When it is committed intentionally * * *

"* * * * *

"(c) By abuse when a person, recklessly under circumstances manifesting extreme indifference to the value of human life, causes the death of a child under 14 years of age * * * and:

"(A) The person has *previously* engaged in a pattern or practice of assault * * * of the victim or another child under 14 years of age * * *." (Emphasis supplied.)

[2] ORS 163.125(1)(a) provides that criminal homicide constitutes manslaughter in the second degree when it is committed "recklessly."

■    To establish the crime of murder by abuse, the state, among other elements, had to prove beyond a reasonable doubt that defendant recklessly caused Tommy's death under circumstances manifesting extreme indifference to the value of human life and that defendant had previously assaulted Tommy or Tommy's sister, Karen. At trial, defendant raised the defense, pursuant to ORS 161.205(1),[3] that the previous acts alleged to be assaults constituted the reasonable use of physical force by a parent for the discipline or welfare of a child. Therefore, the state also had the burden of disproving that defense. *State v. Waller*, 22 Or App 299, 538 P2d 1274 (1975).

Defendant's eight-year-old daughter, Karen, testified at trial that on the morning that Tommy disappeared, she saw defendant strike Tommy in the face four times when the two were out in the yard of their home. According to Karen, defendant held Tommy's hands behind his back while striking him. Tommy fell down and lay on his back. Defendant carried Tommy to his car and placed him in the back seat. Karen saw Tommy's hand waving through the car window as the car drove off. Karen saw defendant return, observed him to park the car in the same spot, sweep away the tire marks with a tree branch and then leave to go jogging. The jury could properly infer from Karen's testimony that Tommy did not return with defendant.[4]

Tommy's mother testified that, on the morning that Tommy disappeared, she heard a shot fired close to the house after Tommy went outside to play. She thought it odd that defendant would be target practicing because she thought he had gone jogging. Later, while defendant was jogging,

---

[3] ORS 161.205 provides, in part:

"The use of physical force upon another person that would otherwise constitute an offense is justifiable and not criminal under any of the following circumstances:

"(1) A parent, guardian or other person entrusted with the care and supervision of a minor * * * may use reasonable physical force upon such minor * * * when and to the extent the person reasonably believes it necessary to maintain discipline or to promote the welfare of the minor * * *."

[4] Karen's testimony was highly disputed by the defense on the grounds that it was inconsistent with her prior statements and that Tommy's disappearance occurred when she was only five years old.

Tommy's mother began to look for Tommy. She never found him. When defendant returned from jogging, she noticed that he had taken his .45 caliber pistol with him, something she had never known him to do before. She told defendant that Tommy could not be found and confronted him about shooting while the children were in the yard. Defendant replied that he had shot at a stray cat and that he had a good backstop for the shot.

A state police detective testified that he suggested to defendant, in the presence of Tommy's mother, that perhaps defendant had accidentally shot Tommy while shooting at a stray cat. Defendant denied to the detective that he had shot Tommy but late that same night, Tommy's mother testified that she overheard defendant talking on the telephone with his half-sister, Deb Calek. She heard him say, "Deb, I killed Tommy, and [Tommy's mother] is never going to forgive me for it."

Deb Calek testified:

> "I was called to the phone and I answered and [defendant] was very upset, very—his sentences were very rushed. He said, 'I'm in trouble. I killed Tommy.' Not 'I think I killed Tommy' or 'I could have' but 'I killed Tommy and I might need some bail money.' And I said, 'What the hell do you mean you killed Tommy?' And he said a Detective Benz had been there that day and [defendant] told me that it was suspected that me [*sic*] might have accidentally shot Tommy when he was shooting at the wild cat. And I said, 'When's the funeral?' And, 'There's no funeral.' I said, 'What do you mean? If you killed him we have got to have a funeral.' He said, 'We don't have a body.' I said, 'Now, wait a minute. You shot Tommy, you don't have a body?' He said, 'Right.' And I said, 'You shot Tommy but there's no body, nobody found a dead body?' He said, 'Right.' "

Defendant assigns error to the denial of his motion for judgment of acquittal made after the state presented its case-in-chief. First, he argues that there was insufficient evidence for a rational trier of fact to conclude that a criminal homicide had occurred, and second, that even if the evidence supports a finding that Tommy died because of a criminal homicide, there is insufficient evidence that defendant was the criminal agent responsible.

■■ We view the evidence in the light most favorable to the state, resolving all conflicts in its favor. *State v. Krummacher*, 269 Or 125, 523 P2d 1009 (1974). According to Karen's testimony, she saw defendant pin Tommy's arms behind his back while he struck Tommy four times about the head, knocking him to the ground where he lay on his back. A rational trier of fact could have found that striking a toddler in that manner was a reckless act that could cause Tommy's death. The jury also could have rationally concluded that defendant recklessly fired his pistol causing the boy's death. In the light of defendant's admission to his half-sister that "I killed Tommy," either of those theories could lead a rational jury to conclude that defendant was the agent responsible for Tommy's death and that his action was criminal. We conclude that there is evidence from which the jury could have properly found the essential elements of the crime of manslaughter in the second degree beyond a reasonable doubt. The trial court did not err by denying defendant's motion for judgment of acquittal.

Next, defendant assigns error to the admission of uncharged misconduct evidence involving his treatment of his daughter Lisa, two years after Tommy disappeared. During the state's case-in-chief, the prosecutor asked Tommy's mother about defendant's treatment of Lisa. Defendant objected, arguing that evidence of his treatment of Lisa was not relevant to prove that he killed Tommy, because Lisa had not yet been born when Tommy disappeared. He further argued that, even if relevant, the evidence should not be admitted because its probative value was substantially outweighed by the danger of unfair prejudice. OEC 403.

Outside the jury's presence, the court received an offer of proof. Based on the offer, the trial court ruled that the evidence was relevant, without stating a rationale on the record, and that its probative value exceeded the danger of unfair prejudice. After the jury returned, Tommy's mother testified as follows:

"Q.   Please tell us about the incident with Lisa.

"A.   When I came back from the hospital after having Kristina, I observed red marks on Lisa's leg just underneath her buttocks and when I asked Larry about them, he said that they were rug burns and I didn't think that rug burns could be caused there. And then I witnessed him hit Lisa when she got in his way hard enough to knock her down and it also caused red marks on her legs.

"Q.   Where were those red marks in relation to the ones you'd observed when you came home from the hospital?

"A.   In the same area.

"Q.   Turning your attention back to before March 18th, '91, [the date Tommy disappeared] can you give us an estimate of how many times you observed red marks or bruises on your children?

"A.   (No response).

"Q.   Actually, what I want to ask is not just red marks or bruises. How many times the defendant left red marks or bruises on the children?

"A.   Numerous times.

"Q.   What does that mean to you?

"A.   He was always hitting them hard enough to leave marks."

In *State v. Hampton*, 317 Or 251, 254, 855 P2d 621 (1993), the Supreme Court discussed the three-part test for determining the admissibility of uncharged misconduct evidence under OEC 404(3).[5] It stated:

" '(1) The evidence must be independently relevant for a noncharacter purpose * * *; (2) the proponent of the evidence must offer sufficient proof that the uncharged misconduct was committed and that defendant committed it; and (3) the probative value of the uncharged misconduct

---

[5] Oregon Rule of Evidence 404(3) provides:

"Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

evidence must not be substantially outweighed by the dangers of considerations set forth in OEC 403. Each of these requirements must be satisfied before uncharged misconduct evidence is admissible under OEC 404(3).' " (Citation omitted.)

The first question under this assignment of error is whether the evidence regarding Lisa was relevant for a purpose independent of proving defendant's character.[6] Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OEC 401. On appeal, the state argues that the "doctrine of chances" as discussed in *State v. Wieland*, 131 Or App 582, 587, 887 P2d 368 (1994), and *State v. Johns*, 301 Or 535, 552, 725 P2d 312 (1986), supports its argument that the uncharged misconduct evidence was relevant, because

"defendant's repeated assaults of Lisa make it improbable that he lacked the requisite intent to assault Tommy on the day he disappeared, or for that matter, on any of the occasions he assaulted either of his children prior to Tommy's death. Because intent was an issue, contrary to defendant's argument, absence of mistake or accident also was an issue in this case."[7]

*Wieland* involved a prosecution for aggravated murder. 131 Or App at 584. The state sought to prove that the defendant murdered his mother in 1986 in order to conceal his identity as the person who caused some fires that year on the property where they both lived. To that end, the state offered evidence that fires occurred in 1984 on defendant's property and in 1991 on property acquired after his mother

---

[6] " '[C]haracter' refers to disposition or propensity to commit certain crimes, wrongs or acts." *State v. Johns*, 301 Or 535, 548, 725 P2d 312 (1986).

[7] The state also argues on appeal that the evidence was admissible during the state's case-in-chief to rebut defendant's evidence, on the assumption that defendant would attempt to portray himself as a peaceable father who did not use excessive force in disciplining his children. Evidence of specific instances of uncharged misconduct is admissible for this purpose, if at all, only after defendant puts his character at issue during the defense case, hence the word "rebuttal." *See State v. Guritz*, 134 Or App 262, 894 P2d 1235, *rev den* 321 Or 560 (1995). However, we know of no case, nor have we been directed to any, where the state has been allowed to rebut the defendant's evidence of good character before the defendant offers it.

was murdered. We held that the evidence of the 1991 fires was relevant under the doctrine of chances to prove that the earlier fires were caused by arson, because "the very fact that the 1991 fires occurred on defendant's property makes it more likely that the fires that occurred on defendant's property in 1986 were not accidental." *Id.* at 587-88. We said that "[a]s a matter of logic, the more often an unusual event occurs, the less likely it is that the occurrence is accidental."[8] *Id.* at 589.

In *Johns*, the defendant was charged with murdering his wife. 301 Or at 537. According to the state's theory, the defendant came home one morning and intentionally shot his wife in the head while she was in bed. The defendant claimed that when he came home in the morning he found his wife still asleep. When he entered the bedroom, she became startled and fired a pistol at him. He attempted to wrestle the pistol away from her and, in the struggle the pistol fired a second shot that struck his wife in the head, causing her death. *Id.* at 537-38.

To overcome the defendant's claim of accident, the state sought to introduce evidence that six years earlier the defendant had pointed a loaded rifle at his former wife and threatened to kill her. He was convicted of misdemeanor assault for the prior act. *Id.* at 540-41. The court pointed out that there were remarkable similarities in the circumstances of both events and concluded that, in the face of the defendant's claim of accident, the prior act of misconduct was relevant because it tended to make it less probable that the charged act was an accident and more probable that the defendant acted intentionally.

■     The present case does involve an unexplained event, Tommy's disappearance, that could be attributed to an accident. However, the testimony about defendant's abuse of Lisa is not evidence of a second unexplained disappearance that would tend to make it less likely that the first disappearance was accidental. Our holding in *Wieland* is inapposite for that reason. Similarly, the holding in *Johns* does not control. The similarities between the two events that occurred in

---

[8] *See* Imwinkleried, *Uncharged Misconduct Evidence* § 2.05 (1984).

*Johns* do not exist here. The fact that defendant struck Lisa causing bruises several years after Tommy's disappearance does not tend to make it more likely that he recklessly caused Tommy's death under "circumstances manifesting extreme indifference to the value of human life." ORS 163.115(1)(c). The evidence, if relevant at all, tends only to prove that "once a child abuser always a child abuser." Accordingly, we reject the state's argument that the evidence about Lisa is relevant for a noncharacter purpose.

■     In order to prove its charge of murder by abuse, the state was required to prove that defendant had "previously engaged in a pattern or practice of assault * * * of the victim or another child." ORS 163.115(1)(c)(A). To prove an assault, the state must prove at least that defendant acted recklessly. The state argues that the evidence about Lisa is relevant to show defendant's state of mind when he struck Tommy and Karen before Tommy's disappearance. Tommy's mother testified that, a few days before Tommy disappeared, she heard a loud noise coming from the kitchen where defendant and Tommy were at the table. Tommy screamed and was lying on the floor next to his fallen-down high chair. He was holding his hands over his face, and his face had red, finger-shaped marks on it. Tommy's mother told defendant not to hit the children so hard. Defendant responded that he did not believe that he had hit Tommy too hard.

Tommy's mother also testified that defendant either hit or pushed Tommy out of the way more than once every day in the days leading up to Tommy's disappearance. She said that the blows often left welts and bruises on the side and back of Tommy's thighs. She attributed defendant's conduct to his being angry whenever Tommy "got in his way," such as when defendant wanted to watch television. She testified that, although it happened less often, defendant also struck Karen in a similar way before Tommy disappeared. A friend of Tommy's mother testified that she once witnessed defendant knock Karen to the ground because Karen interfered with his television viewing. Karen landed on her shoulder and face and had red marks on her cheek.

■     Unlike the defendant in *Johns*, defendant does not claim that his striking of Karen or Tommy before Tommy's

disappearance was an accident. Rather, he claims that his actions constituted reasonable disciplinary measures. His conduct toward Lisa in 1993 does not have a tendency to make it more likely that he was acting recklessly when he struck Karen or Tommy in or before 1991, even if his acts toward Lisa were reckless in the sense that they caused injury to her. The circumstances in 1993 have no relationship to defendant's state of mind as to the preceding events.[9] We conclude that the evidence was not relevant for the purposes advanced by the state and that the trial court erred in admitting it.

Next, we must determine whether the error in admitting the evidence requires reversal. "Evidential error is not presumed to be prejudicial." OEC 103(1). In *State v. Keller*, 315 Or 273, 285, 844 P2d 195 (1993), the Supreme Court stated:

> "Under Oregon law, 'a verdict against a criminal defendant may be affirmed notwithstanding trial error if the error did not affect a "substantial right" of the defendant. OEC 103(1). This court has interpreted this to mean that the verdict may be affirmed if there is "little likelihood that the error affected the verdict." ' " (Citations omitted.)

The jury had before it the eyewitness account of Tommy's disappearance and defendant's admission to his sister that he had killed Tommy. The evidence about his abuse of Lisa was only part of the evidence about defendant's abuse

---

[9] According to Imwinkleried, *Uncharged Misconduct Evidence* § 2:11, 33 (1984):

> "The admissibility of a subsequent act depends upon the proponent's theory of logical relevance. The relevance of subsequent acts should be gauged by the same standards as those applied to prior acts. If logically relevant, a subsequent act can be admitted. A subsequent act should be excluded if it is irrelevant but not simply because it is subsequent." (Footnotes omitted.)

*See State v. Zyback*, 308 Or 96, 775 P2d 318 (1989) (holding that evidence that after defendant had sexual intercourse with a 13-year-old girl, he had continued encounters with her in an effort to encourage her to have sex with him was admissible to show why she did not report the sexual assault until nine months after it occurred). *See also United States v. Hearst*, 563 F2d 1331, 1336, *cert den* 435 US 1000 (9th Cir 1977) (holding that evidence of subsequent acts of uncharged misconduct was relevant to prove intent where defendant claimed that she was acting under duress during the charged act. The subsequent acts tended to show that the defendant "willingly engaged in other criminal activity with persons of the same group at a time not unduly remote.").

of his children. Under the state's theory of murder by abuse, the evidence of abuse of Tommy and Karen was relevant to show that defendant had previously abused the victim and other children. In that regard, multiple witnesses testified that defendant struck Tommy and Karen. The jury could also have found that abuse occurred outside the family home. One incident involved defendant's arguably excessive discipline of one of the children while the family was attending church. According to the witness, the child was struck hard enough that the blow echoed throughout the building. Defendant did not contest that he had disciplined his children on occasion. Rather, he offered evidence that his discipline was not excessive or frequent. Regardless, the verdict tells us that the jury believed that defendant was responsible for Tommy's disappearance and death but that the state's evidence was not sufficient to prove that defendant had intentionally abused Tommy and Karen previous to Tommy's disappearance. In light of the verdict and all the admissible evidence, there is little likelihood that the evidence about the abuse of Lisa had any effect on the jury's ultimate decision that defendant necessarily caused Tommy's death.

Defendant's other assignment of error is not well taken and does not require discussion.

Affirmed.