Argued and submitted March 4, 1996, reversed and remanded for new trial April 30, both petitions for review allowed September 23, 1997 (326 Or 57)

STATE OF OREGON,
*Respondent,*

*v.*

GARY TODD STEVENS,
*Appellant.*

(10-92-10418; CA A85716)

938 P2d 780

Stephen A. Houze argued the cause and filed the brief for appellant.

Kaye Sunderland argued the cause for respondent. On the brief were Theodore R. Kulongoski, Attorney General, Virginia Linder, Solicitor General, and Ann Kelley, Assistant Attorney General.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

EDMONDS, J.

Warren, P. J., dissenting.

## EDMONDS, J.

Defendant appeals from convictions for murder by abuse and intentional murder of Sarah Rambeck, an 18-month-old child. ORS 163.115. He makes ten assignments of error. We discuss only those assignments that benefit the bench and bar, and we reverse defendant's convictions.

Sarah Rambeck died sometime between 9:00 p.m. and midnight on May 7, 1992, from massive blows to the abdomen and the head. Defendant and Sarah's mother, Lisa Rambeck, were the only two adults who were with Sarah during that time. At trial, defendant's position was that Sarah had been killed by her mother. Defendant did not offer his own testimony about what happened but offered circumstantial evidence of Rambeck's actions before and after Sarah's death that he claims demonstrates that she was the perpetrator of the crimes. In support of his theory of the case, defendant sought to offer evidence that Rambeck had slapped and screamed at her other two children in 1989 and 1992. Defendant's initial assignments of error concern the refusal of the trial court to admit that evidence during the cross-examination of Rambeck. The trial court ruled that the evidence was inadmissible character evidence.

Character evidence is evidence of a particular human trait and indicates a person's disposition or propensity towards certain behavior. *State v. Marshall*, 312 Or 367, 371-72, 823 P2d 961 (1991). OEC 405 provides that, when evidence of character is admissible, proof can only be made by reputation or opinion testimony and that specific instances of conduct are not admissible, subject to certain exceptions.

OEC 404(3) provides:

"Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

To be admissible under OEC 404(3), the evidence must be (1) independently relevant for a noncharacter purpose, (2) the proponent of the evidence must offer sufficient proof

that the misconduct was committed and (3) the probative value of the misconduct must not be substantially outweighed by the unfair prejudicial effect of the evidence. *State v. Hampton*, 317 Or 251, 254, 855 P2d 621 (1993).

In *State v. Gibson*, 144 Or App 523, 928 P2d 344 (1996), *rev den* 325 Or 80 (1997), we considered the admissibility of similar evidence of specific instances where the defendant had assaulted his other children in the context of an intentional murder and murder by abuse prosecution. We noted the lack of similarities between the prior misconduct and the circumstances surrounding the charged crimes. Accordingly, we rejected the state's argument that the evidence of the prior misconduct had any relevance to the defendant's state of mind regarding the events that led up to the death of the victim. *Id.* at 533.

■ In this case, defendant offered the specific instances of Rambeck's treatment of her other children to prove her "state of mind" and "modus operandi." The trial court did not err in ruling initially that defendant could not cross-examine Rambeck about her mistreatment of her other children to prove that she had killed Sarah. In substance, that evidence is simply evidence that, because she mistreated her other children in the past, she must have killed Sarah. The evidence is not probative to demonstrate that she abused Sarah on May 7, 1992, and is exactly the kind of character evidence that we held inadmissible in *Gibson*. Moreover, the circumstances surrounding Rambeck's treatment of her other children in public places bear no similarity to the circumstances surrounding the death of the child in this case, who was found battered in her crib and died as a result of massive abdominal and head injuries.

■ Next, defendant makes several assignments of error regarding the admission of evidence about his assaults and abuse of Rambeck. During the trial, Rambeck initially testified without objection that defendant physically abused her. Defendant objected for the first time when the prosecutor asked her about the circumstances that had caused an earlier separation between him and Rambeck. The trial court ruled that because defendant's theory was that Rambeck caused her daughter's death, the evidence was relevant to refute

that theory, to explain her actions and to lay the foundation for testimony from a subsequent witness that Rambeck suffered from battered women syndrome (BWS). Later, other evidence was admitted over defendant's objection that corroborated Rambeck's testimony. That evidence is the subject of several other assignments of error. All of the evidence is admissible if the expert's testimony about BWS was properly admitted, so we turn to that issue.

■ First, the state contends that defendant has not preserved his argument on appeal regarding the BWS testimony because defendant did not specifically argue to the trial court that BWS is not a "scientific theory" under *State v. Brown*, 297 Or 404, 687 P2d 751 (1984).[1] However, the state and defendant filed extensive memoranda in the trial court about whether BWS evidence should be admitted, and the holding in *Brown* was briefed by the parties and addressed by the trial court. In *State v. Hitz*, 307 Or 183, 188, 766 P2d 373 (1989), the court held that for purposes of preservation, the "raising" of an issue at trial is "essential," but "identifying" a particular *source* for a claimed position and making a particular *argument* are less essential. Defendant's presentation to the trial court suffices under *Hitz* to preserve the issue he now raises on appeal.

■ We then turn to the issue of whether, under *Brown*, testimony regarding BWS is admissible scientific evidence.[2] The *Brown* test requires us to apply OEC 401, 702, and 403 and to

> "identify and evaluate the probative value of the [proffered scientific] evidence, consider how [that evidence] might impair rather than help the factfinder, and decide whether truthfinding is better served by exclusion or admission." *Brown*, 297 Or at 409.

---

[1] In *State v. Lyons*, 324 Or 256, 270-71, 924 P2d 802 (1996), the Supreme Court reaffirmed the *Brown* test as the test to determine whether "scientific" evidence is admissible.

[2] In determining whether BWS was properly admitted, we evaluate the evidence using the factors set forth in *State v. Brown*, 297 Or 404, 687 P2d 751 (1984). *See State v. Milbradt*, 305 Or 621, 631, 756 P2d 620 (1988) (suggesting that the *Brown* test should be used to evaluate "syndromes"); *see also State v. St. Hilaire*, 97 Or App 108, 112-13, 775 P2d 876 (1989) (using the *Brown* test to analyze whether evidence about a sexual abuse syndrome was properly admitted).

Specifically, the factors to be considered are:

"(1) The technique's general acceptance in the field;

"(2) The expert's qualifications and stature;

"(3) The use which has been made of the technique;

"(4) The potential rate of error;

"(5) The existence of specialized literature;

"(6) The novelty of the invention; and

"(7) The extent to which the technique relies on the subjective interpretation of the expert." *Brown*, 297 Or at 417.

Those factors are not intended to be exclusive nor to be considered as a mechanical checklist. Thus, what is necessary is not a lock-step analysis of each factor but the consideration of each factor in terms of the overall probative value of the proffered evidence. *Id*. at 417-18.

The state's pretrial offer of proof centered around Professor Karil Klingbeil's testimony. Klingbeil holds a bachelor's degree in sociology and psychology and received her master's degree in social work in 1960 from the University of Washington. She is employed at the University of Washington as an associate professor, teaches in the graduate school there and is also the director of social work at Harbor View Medical Center, a hospital affiliated with the university. Klingbeil instructs others in the areas of assessment, detection and recognition of violent behaviors, violent acts, battered women syndrome, child abuse syndrome and other components of interpersonal violence, including elder abuse. She has over 20 years of experience in clinical research and teaching in the field of interpersonal violence, which includes a number of components, including violence toward women.

In 1973, Klingbeil founded the Sexual Assault Center at Harbor View, which is a nationally recognized program that deals with victims of child sexual abuse, incest and adult victims of rape. She has also published a number of articles pertaining to the assessment and identification of battered

women. Previously, she has been accepted as an expert witness in courts in the states of Washington, Alaska, Idaho and Montana.

In her pretrial testimony, Klingbeil testified that there is a significant amount of literature about BWS and the methodology of diagnosing a person with BWS. She also testified that when she diagnoses a person with BWS, she follows a method of evaluation that is accepted within the psychological community. That process of evaluation consists of a variety of steps in which the evaluator conducts a psychosocial interview and examines the subject's childhood, adolescence, adult life, family of origin, employment history and previous relationships during the person's adult life. It also includes consideration of the subject's education, health care records, shelter care records, history of substance abuse, and criminal justice records. Also, interviews of family, friends and other witnesses are conducted.

Klingbeil defines BWS as

"a psychological diagnosis that refers to a collection or pattern of characteristics coupled by abuse which may be physical, psychological, sexual, or social, or all of those kinds of abuse, occurring over a period of time, usually repeatedly.

"* * * * *

"* * * [BWS] is often referred to as a subset of posttraumatic stress disorder."[3]

She explained that BWS was first written about in 1977 and that since that time, the diagnostic techniques for BWS have been evolving.

According to Klingbeil, a person suffering from BWS exhibits certain behaviors:

"[T]hey're clusters of symptoms that often include dissociative reactions, numbing responses, inability to relate to one's environment and/or family. They include low self-esteem. They include hypervigilance, depression, as some

___

[3] Klingbeil defined posttraumatic stress disorder as being "very well written about, [and] included in the DSM-III-R, which is a * * * psychiatric diagnostic and statistical manual."

of the more salient features. There clearly are some other factors, including suicide ideation and suicide attempts."

After evaluating Rambeck, Klingbeil concluded that she suffers from BWS and that such a diagnosis explains her actions, actions that might otherwise lead to an inference that she killed her child.

On appeal, defendant analyzes each of the *Brown* factors and argues that BWS is not a diagnosable psychological condition. We disagree. Klingbeil's testimony reveals that BWS is an accepted diagnosis within the psychological community and that there is a specific method for diagnosing and treating the syndrome. From the materials presented to us, it appears that expert testimony about BWS has been admitted in at least 17 states and that there are numerous recent books and articles that demonstrate the general acceptance of the theory.[4] Moreover, the requirements of OEC 401 and 702 are satisfied in that the testimony is relevant to explain Rambeck's behaviors and actions and helpful to the trier of fact to understand her behavior. Furthermore, the testimony is not excludable under OEC 403, because the probative value is not substantially outweighed by the danger of unfair prejudice. We conclude that the evidence elicited at the pretrial hearing satisfies the *Brown* criteria. We hold that, under the circumstances of this case, the trial court did not err in admitting evidence of BWS.[5]

---

[4] *See* Annotation, *Admissibility of Expert or Opinion Testimony on Battered Wife or Battered Women Syndrome*, 18 ALR4th 1153 (1982 supp 1995); *Rodgers v. State*, 616 So 2d 1098, 1099 n 3, *aff in part, rev in part* 630 So 2d 177 (Fla 1993) (listing books and articles expressing the acceptance of the theory underlying the syndrome); *see also* California Evidence Code 1107; *State v. Ciskie*, 110 Wash 2d 263, 751 P2d 1165 (1988) (allowing BWS evidence to explain the behavior of the victim of an assault); *United States v. Winters*, 729 F2d 602 (9th Cir 1984) (allowing government to present BWS evidence to explain why a kidnapped woman forced to engage in prostitution did not try to escape); *Ibn-Tamas v. United States*, 407 A2d 626 (DC App 1979) (BWS evidence is admissible to allow the jury to evaluate the woman's claim of self-defense or to understand a mental state); *Note, The Admissibility of Expert Testimony on Battered Wife Syndrome: An Evidentiary Analysis*, 77 NWUL Rev 348 (1982).

[5] We do not decide whether evidence of BWS will always be admissible in every case, nor do we decide under what circumstances it will be admissible. *See, e.g., State v. Mott*, 931 P2d 1046 (Ariz. 1997) (holding that BWS evidence is inadmissible as a defense to a charge of child abuse).

■ Also, defendant assigns as error the trial court's refusal to allow him to inquire into the phenomenon of "pecking order battering" (POB) and to cross-examine Klingbeil regarding the allegation that Rambeck had assaulted her other children. POB is a term used to describe a behavior pattern that is apparent in some women who have been battered. In essence, POB is the theory that some battered women have a propensity to batter a person lower in the hierarchy or power scheme (usually children) than themselves in response to their situation. When Klingbeil examined Rambeck, she made an inquiry about Rambeck's behavioral responses that are pertinent to POB. Ultimately, the trial court allowed defendant to cross-examine Klingbeil generally about the characteristics of BWS, including irritability, outbursts of anger and POB, but prohibited him from asking her whether she was aware of specific acts of misconduct by Rambeck against her other children.

On appeal, defendant argues that the trial court's ruling contravenes OEC 611(2).[6] Defendant contends that when the trial court allowed Klingbeil to testify about BWS, he should have been allowed to explore all the characteristics of BWS so that the jury could assess the significance of the BWS testimony in regard to his position that Rambeck killed Sarah. The state argues:

> "The trial court allowed defendant to ask the expert about [POB]. Defense counsel declined to do so after realizing that if he did so, he would be opening the door to evidence that could be disadvantageous to him. In addition, because the expert said that the existence of [POB] would have had no effect on her conclusion that Rambeck suffered from [BWS], and that she would have said she saw no signs of [POB], exclusion of this evidence could not have been prejudicial error."

On direct examination by the state, Klingbeil was not asked about POB. On cross-examination, when defendant raised the issue of POB, the state then asked a question

---

[6] OEC 611(2) provides:

"Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination."

in aid of an objection. The prosecutor inquired of Klingbeil, "[D]id you find characteristics of [POB] as part of your diagnosis in this case?" Defendant then objected to that question and examined Klingbeil out of the presence of the jury:

Q: "Would it be correct that one of the characteristics that is exhibited by battered spouses is [POB]?

A: "Yes, it may.

Q: "It would be consistent with the diagnosis of a battered person that they engage in [POB]?

A: "Well, in all these characteristics, we look to rule in and rule out, that they, by themselves, don't make the diagnosis. So we look at, in personal interviews, for information that elicit that. Just like we look at denial. These are characteristics that we have found in a number of—over 5,000, about 6,000—maybe more than that now—battered persons. But they don't—they're not all there, universally.

Q: "Just as it is a behavioral characteristic that a battered spouse may not be fully aware of injuries suffered by their children, in the same way, that's a characteristic of being a battered spouse?

A: "Yes."

After defendant completed his offer of proof, he told the court:

"Well, your Honor, just by way of argument, she's offered her diagnosis of Lisa Rambeck's being a battered woman. I think we are entitled to ask what other ramifications flow from that on cross-examination. We are entitled to ask questions about the significance of the diagnosis that are not absolutely limited to the areas that the State brought up."

In part, the state responded:

"That makes [defendant's] question, beyond identifying it as a potential characteristic for her to look for, as irrelevant * * * [u]nless there is a finding that it existed, then no further examination into the issue of [POB] would be relevant to her testimony because she's not testified that a basis for her opinion was a finding that that characteristic existed in the relationship."

Defendant countered:

"[I]f the witness says she didn't see any [POB], if she is allowed to answer that, then, of course, the next question is: 'Well, were you told about the other things? Did anybody tell you about the 1989 incident in which there was [POB] regarding the 1992 incident?' "

The trial court then attempted to pinpoint how the evidence was relevant:

"[The Court:] Let's back up, * * * What is it that you think that your question proves?

"[Defense Counsel:] I think it proves that people with this condition are—are characterized by being observed to engage in [POB], which is battering of children, people lower than them in the power structure. * * *

"[The Court:] Wait a minute. Wait a minute. You can't quit that soon. That, by and of itself, has no relevance. So what's the relevance of that?

"* * * * *

"[The Court:] [I]s that the answer to that question is irrelevant without the answer to the next question or the inference that comes from that. And that is if she slapped a kid, if she threw a kid about in the crib, if she did this to the other kid, therefore she must have killed her daughter. That's the only place that can go. It's the only place that can go, logically, to make it relevant. Right?

"[Defense Counsel:] Yes.

"[The Court:] Right. That does not go to the kinds of things that either [OEC] 404 or [*State v. Johns* 301 Or 535, 725 P2d 312 (1986)] permits. That is simply a road to putting in other bad acts to try and convince the jury that she acted in conformity with that history of bad acts by killing her daughter.

"They are not admissible, you can't even start down that path because the only logical conclusion for that is inadmissible.[7]

"* * * * *

---

[7] Defendant did not argue to the trial court that his offer of proof was proper impeachment of Klingbeil's testimony.

"[Defense Counsel:] I want to make sure I got the point clear. Without getting into the other areas, we feel it would be appropriate to elicit the information that persons with this syndrome show—one of the characteristics of them is they show irritability, outbursts of anger, and engage in [POB], without taking it any further.

"[The Court:] Well, frankly, I don't see any objectionability to that if it doesn't go any further. I am warning you, you pull on that door, that's as far as that door is going. No matter what the State asks, you are not going to be able to say they opened the door, and what not, because you are opening it first.

"* * * * *

"[Defense Counsel:] Okay. We're inclined to not ask the question and not get into the whole area, so I won't ask about [POB]."

The trial court's ruling put defendant in a position where he was allowed to ask generally about POB but not about whether Klingbeil was aware of Rambeck's alleged mistreatment of her other children. Because of the trial court's preemptive ruling, counsel then chose not to inquire further for strategic purposes. Consequently, the jury heard no evidence about POB. We perceive no waiver by defense counsel of his intention to ask Klingbeil about the import of specific instances of Rambeck's mistreatment.[8] Rather, he was forced by the court's ruling to abandon his intended line of inquiry.

On the merits, the issue is whether the trial court's ruling was error because the state offered evidence of BWS and its effect on Rambeck to disprove defendant's theory of the case. Rambeck's actions before and after Sarah's death are susceptible to the inference that she was the guilty party. Her state of mind or intent regarding those actions therefore became probative. Once the state undertook to prove her

---

[8] The dissent isolates one statement made by defense counsel as the support for its position that "defendant simply accepted the trial court's ruling and moved on with his case." 147 Or App at 610. The colloquy between the court and trial counsel has been fully set out to lend context to counsel's statement. In particular, defense counsel told the court that defendant was "entitled to ask what other ramifications" arose from Klingbeil's testimony and that the "significance" of her diagnosis was not "limited to the areas that the state brought up."

state of mind regarding those actions by its evidence that she suffered from BWS, defendant was entitled to show that her condition was consistent with his theory of the case also.

The trial court erred when it reasoned that the evidence of specific instances of misconduct was inadmissible under OEC 404. In particular, OEC 404(3) allows evidence of specific instances of bad conduct as proof of an actor's intent or state of mind. *See State v. Bannister*, 118 Or App 252, 256, 846 P2d 1189 (1993) (evidence of prior sexual abuse was admissible in a prosecution for kidnapping to rebut the defendant's claim that he took his daughter because he was concerned about her education). In this case, the state put Rambeck's state of mind in issue by introducing the BWS testimony to refute defendant's claim that Rambeck was the perpetrator of the crime and to explain what otherwise could be considered incriminating conduct. Defendant was entitled to elicit evidence on cross-examination of Klingbeil that would affirmatively support his contrary position. We conclude that the trial court erred in limiting defendant's cross-examination by not permitting admission of the evidence of specific instances of mistreatment for that purpose.

■ The final assignment of error that warrants discussion concerns the ruling by the trial court on defendant's motion to limit the state's use of the evidence of defendant's assaultive behavior in closing arguments. Before closing arguments, defendant sought to prohibit "the state from arguing that the defendant's actions towards [Rambeck] can be viewed as evidence that defendant has a propensity towards violence and is therefore more likely to have injured or killed [the child]." The court ruled that because the evidence was admitted without restriction, it could be used for any purpose.

During closing argument, the prosecutor made several references to defendant's abuse of Rambeck:

> "The [Defendant] is a violent, assaultive animal, [and] he engaged in the same behavior that he engaged in with Lisa Rambeck with Sarah Rambeck, and that * * * behavior caused [Sarah's] death.
>
> "* * * * *

"We have in the short slice of the Defendant's life that we know of that relates to this case, eight or nine or ten, whatever there are, violent, explosive, unprovoked incidents that are compatible with the actions of the killer of Sarah Rambeck[.]

"* * * * *

. "In addition to the fact that there are a number of these violent and explosive episodes, when we look at the particulars of them further, we see similarities between what happened in them and what happened to Sarah Rambeck. And isn't there a strong similarity between [the Defendant grabbing Ms. Rambeck by the head] * * * and what happened to Sarah Rambeck that caused her skull fracture?"[9]

Defendant argues that the trial court's refusal to restrict the use of the evidence of his prior assaultive conduct is error because he objected to the evidence at the time that it was offered and that he was not required to request a limiting instruction until the time for arguments and jury instructions. Defendant's motion is tantamount to a request for a limiting instruction to the jury. If granted, it would have restricted the use of the evidence by the parties in argument and by the jury in its deliberations.

■ OEC 105 provides:

"When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, *the court, upon request, shall restrict the evidence* to its proper scope and instruct the jury accordingly." (Emphasis supplied.)

The plain text of the rule does not impose any temporal requirements.[10] In fact, the rule specifically requires the court to

_____

[9] In *State v. Wilson*, 69 Or App 569, 573, 687 P2d 800 (1984), *rev den* 298 Or 553 (1985), we held that the trial court properly ordered the prosecutor to refrain from referring to the defendant as an "animal" and did not abuse its discretion in denying the defendant's motion for a mistrial after giving curative instructions.

[10] In *State v. Larson*, 325 Or 15, 26-27, 933 P2d 958 (1997), the Supreme Court recently interpreted OEC 615, which governs the exclusion of witnesses. In that case, the state argued that the defendant was required to move to exclude witnesses before trial or waive the right under the rule. The court noted that the rule did not expressly require that the motion be brought before trial and, thus, the motion could be brought after witnesses had testified and should have been granted with prospective effect. Similarly, OEC 105 does not require that a motion for a limiting instruction be made at a specific time.

restrict the evidence to its proper purpose once a party requests such a limitation, and the trial court has no discretion in the matter.

Our research does not reveal any Oregon cases interpreting when a defendant must ask for a limiting instruction. However, federal law provides some guidance in interpreting the rule. OEC 105 is identical to Rule 105 of the Federal Rules of Evidence (FRE). OEC 105 Commentary (1981). In *Lubbock Feed Lots, Inc. v. Iowa Beef Processors*, 630 F2d 250, 266 (5th Cir 1980), the court held under FRE 105 that

> "[o]nce the court determines that such evidence should be admitted, however, *it cannot refuse a requested limiting instruction.* * * * Although generally more effective at the time the evidence is presented, limiting instructions may be requested and given as part of the court's final instructions to the jury." (Citations omitted; emphasis supplied.)

*See also* Jack B. Weinstein & Margaret A. Berger, 1 *Weinstein's Evidence*, ¶ 105[05] (1996) (suggesting that it is a better practice to give limiting instructions as the evidence is received but acknowledging that they may be given at the end of the trial).

The federal rule is consistent with the general policy in Oregon that requests for instructions must be made at a seasonable point in the trial that will enable the court to conform the conduct in the trial to the instruction. *Bean v. Tripp*, 99 Or 216, 224, 195 P 355 (1921). Here, defendant had no need to ask for a limiting instruction until the time arrived for closing arguments and jury instructions because no use of the evidence beyond the basis for its admission had been made by the prosecution. The trial court had already overruled his objection to the admissibility of the evidence, and the evidence had been admitted. It was only during closing arguments that the probative value of evidence could be argued for an improper purpose. We hold that the fact that the evidence had been admitted without restriction earlier did not prevent defendant from later seeking a limitation on its use when the request came at a time that was seasonable. Under the circumstances, the trial court was required to give the requested limiting instructions and erred when it refused to do so.

■ ■ The next question is whether the trial court's erroneous rulings require reversal. "Evidential error is not presumed to be prejudicial." OEC 103(1). A verdict against a criminal defendant may be affirmed notwithstanding trial error if the error did not affect a substantial right of the defendant or, in other words, if there is little likelihood that it affected the verdict. *State v. Keller*, 315 Or 273, 285-86, 844 P2d 195 (1993). Considering the effect of the trial court's refusal to allow defendant to cross-examine Klingbeil regarding Rambeck's bad acts and its refusal to limit the prosecutor's emphasis on defendant's bad acts in argument, for the reasons that follow we cannot affirmatively say that the combined effect of the errors did not substantially affect the jury's verdict.

According to the evidence, only one of two people could have killed Sarah, and evidence of specific instances of misconduct were proffered as to both. Because of the trial court's ruling, defendant was prohibited from offering evidence of POB that was probative to the jury's determination of whether Rambeck was the wrongdoer. In contrast, the state was permitted, in violation of OEC 404(3), to use and emphasize evidence of defendant's specific, prior misconduct to urge that he, rather than Rambeck, killed Sarah. When the court's rulings are considered in their totality, the prejudicial effect to defendant's ability to present his theory of the case is apparent. Accordingly, we hold that the trial court committed reversible error by not permitting defendant to cross-examine Klingbeil about Rambeck's specific instances of mistreatment of her other children and by not granting defendant's motion to limit the use of the evidence of his prior misconduct by the state.

Reversed and remanded for a new trial.

**WARREN, P. J.,** dissenting.

In this appeal from a month-long trial, I dissent because the majority reverses the trial court on claimed errors that were not properly preserved for our review and did not work to defendant's prejudice.

The state introduced expert testimony regarding BWS for the purposes of explaining the dynamics of Rambeck's relationship with defendant. It was defendant's theory of the case that Rambeck abused and murdered her own child. The state offered evidence that Rambeck had been physically and emotionally abused by defendant. It then offered the testimony of Professor Klingbeil to explain why Rambeck did not notice or ignored evidence that her daughter was abused, why she failed to report it, and, further, to explain why Rambeck continued her relationship with defendant after her daughter's death. Below, defendant challenged Klingbeil's testimony on the grounds that she lacked the requisite qualifications to offer an expert opinion and diagnosis regarding BWS. Defendant contended that Klingbeil lacked the training and expertise to make such a diagnosis and that her basis of knowledge went to "profile" knowledge, or knowledge of average demographic facts, which defendant contended was not a sufficient basis upon which to render an expert opinion or diagnosis. The trial court properly overruled that objection and defendant does not make that argument on appeal. Defendant raises for the first time on appeal the issue that BWS is not scientifically valid under *State v. Brown*, 297 Or 404, 687 P2d 751 (1984).[1] Because that argument was not raised before the trial court, the majority is mistaken in addressing it.[2]

---

[1] In his brief, defendant provides: "The narrow question presented in this Assignment of Error is, therefore, whether Ms. Klingbeil's testimony relating to BWS satisfied the requirements of *State v. O'Key*[, 321 Or 285, 899 P2d 663 (1995)]."

[2] 1. *Preservation of Error*

The majority is just plain wrong in maintaining that the "extensive memoranda" that the parties filed below properly preserved this issue for our review. Nowhere in the record does defendant challenge the BWS testimony on the ground that it fails to satisfy the *Brown* criteria. The "extensive memoranda" that the majority relies on simply state, without argument, that *Brown* "is the leading Oregon case with regard to the admissibility of expert medical or scientific evidence." The memorandum then proceeds, in summary fashion and without application to the facts in this case, to set out the criteria in *Brown*. Contrary to the majority's position, it takes more than a mere passing reference to raise an issue at trial. The rules pertaining to preservation of error are intended to advance goals such as ensuring that the positions of the parties are presented clearly to the trial court and that parties are not taken by surprise, misled, or denied opportunities to meet an argument. The majority's lunge to address defendant's assignment on a fashionable topic fails to honor a fundamental tenet of appellate procedure.

On cross-examination of Klingbeil, defendant sought to rebut the state's BWS evidence with evidence that Rambeck engaged in "Pecking Order Battering" (POB), a condition sometimes associated with BWS. POB is the theory that some battered women respond to the stress of their situation by battering their children. Defendant sought to pursue that line of questioning as support for his theory that Rambeck was the guilty party. The trial court allowed defendant to inquire generally about POB but precluded him from asking, specifically, about Rambeck's alleged mistreatment of her other two children. On review, the majority concludes:

> "Because of the trial court's preemptive ruling, counsel then chose not to inquire further for strategic purposes. Consequently, the jury heard no evidence about POB. We perceive no waiver by defense counsel of his intention to ask Klingbeil about the import of specific instances of Rambeck's mistreatment." 147 Or App at 603.

The majority is wrong. The pertinent portion of the trial transcript provides:

---

2. *Appellate Scope of Review*

Furthermore, defendant has failed properly to raise the claim of error on appeal. ORAP 5.45(4) provides:

> "Each assignment of error shall be clearly and concisely stated under a separate and appropriate heading, must be specific and *must set out verbatim the pertinent portions of the record*, if it relates to a specific ruling that is being challenged."(Emphasis supplied.)

Because defendant failed to raise the issue below, it is no surprise that his assignment of error fails to comport with ORAP 5.45(4). When a defendant cannot direct us to any place in the record where he raised the issue below, we should decline to search the record in an attempt to find support for his arguments. ORAP 5.45(3); *State v. Kolbe*, 115 Or App 268, 273-74, 838 P2d 612 (1992), *rev den* 315 Or 644 (1993). Appellate courts are limited in their scope of review, and that means that we do not entertain any theory that was not placed before the trial court. *State v. Hickman*, 273 Or 358, 360, 540 P2d 1406 (1975). By indulging defendant's arguments, the majority disregards that principle.

3. *The Merits*

Finally, the majority stylizes all of the evidence of defendant's mistreatment of Rambeck as evidence of BWS. Even assuming that such a syndrome exists, the majority's treatment of that issue here is premature because a jury is always entitled to know about a person's background in order to understand why that person responds in a certain way to certain situations. That a victim's response is consistent with that person's prior experience with the accused is always properly admissible evidence. *State v. Hall*, 108 Or App 12, 17, 814 P2d 172, *rev den* 312 Or 151 (1991).

"[Defense Counsel]: Okay. We're inclined to not ask the question and not get into the whole area, so I won't ask about pecking order battering or this DSM-III-R criterion."

With that statement, defendant, for strategic purposes, or otherwise, acquiesced in the trial court's ruling. When a party, for strategic purposes declines to make an offer of proof, that constitutes a waiver of error, not its preservation. The trial court's ruling did not foreclose defendant from making an offer of proof about Rambeck's alleged mistreatment of her other children. Rather, defendant simply accepted the trial court's ruling and moved on with his case.

Even if we reach the merits of defendant's objection, however, the majority's conclusion that the trial court's ruling warrants reversal is unfounded on two grounds. First, there is simply no evidence in the record that the trial court's ruling was prejudicial to defendant's case. That is because there was nothing favorable that defendant had to gain by following that line of inquiry.[3] Klingbeil testified, first, that

---

[3] When the state was making its offer of proof regarding Klingbeil's testimony, defendant, on cross-examination, asked whether POB was one of the identifiers, in terms of behavioral characteristics, of BWS. Defendant then asked Klingbeil to explain the phenomenon of POB and she did. Defendant then proceeded to question Klingbeil as follows:

"[Defense Counsel]: Would it change your opinion that Lisa Rambeck was a battered woman if you knew she had battered her children?

"[Klingbeil]: No, it wouldn't change my opinion about whether she was a battered woman or not.

"* * * * *

"[Defense Counsel]: Hypothetically speaking, if I provided you with information, hypothetically, that Miss Rambeck abused her own children, you have indicated that would not change your diagnosis?

"[Klingbeil]: Not necessarily change my diagnosis.

"* * * * *

"[Defense Counsel]: If you were told that Miss Rambeck, within a month before the death of Sarah, was observed slapping her then six-year-old son on the head and mouth, slapping her four-year-old daughter on the head and mouth, saying things—apologies for the language—but saying such things as, 'Shut your fucking mouth. Shut the fuck up,' and then was observed pulling them by the hair into a car, would that change your diagnosis that Lisa Rambeck was a battered woman?

"[Klingbeil]: No.

"[Defense Counsel]: Okay. And would the reason for that be because that behavior could be consistent with your diagnosis?

"[Klingbeil]: Could be.

she did not see any evidence of POB. The uncontroverted evidence is that even if Klingbeil had concluded that Rambeck had exhibited symptoms of POB, it would not have changed her diagnosis. And second, even assuming that there was evidence that Rambeck mistreated her other children, the verbatim portion of the transcript upon which defendant bases his assignment of error, ORAP 5.45(4), fails to direct us to any place in the record where he made the requisite offer of proof under OEC 103 or that the hypothetical instances of mistreatment actually happened. Defendant failed to preserve this question for our review. In this light, there is simply no reason why the majority has to take us on this excursion through the theories of the Battered Woman Syndrome and Pecking Order Battering.

Finally, the majority concludes that the trial court committed reversible error in refusing to grant defendant's motion, just before closing arguments, to limit the state's use of the previously admitted evidence of defendant's mistreatment of Rambeck. The trial court admitted testimony of defendant's assaultive behavior over defendant's objection that the evidence was unduly prejudicial. Defendant concedes on appeal that the evidence was relevant for one of the purposes for which it was offered. There was no abuse of discretion when the trial court found it not unduly prejudicial. Defendant did not at that time seek to limit the state's use of that evidence to the purpose for which it was properly admitted. OEC 105.

Defendant's motion to limit the use of the admitted evidence came just before closing arguments, almost a month after the evidence had been introduced. The trial court denied defendant's motion:

"[The testimony regarding defendant's treatment of Lisa Rambeck] didn't come in with any restrictions, such as an impeachment of something like that. It's evidence in the

---

"[Defense Counsel]: And if you were told that in 1989, when Vanessa was * * * 18 months of age, Miss Rambeck was observed to become extremely frustrated at her 18-month-old daughter's crying and was observed to shake her violently and slam her into a crib, would that change your diagnosis that Lisa Rambeck was a battered woman?

"[Klingbeil]: *No, it doesn't have anything to do with the relationship she's having in this case with Defendant.*" (Emphasis supplied.)

case to prove a particular thing. If it proves something else, so be it. Motion will be denied."

Defendant assigns that ruling as error. His specific argument, however, focuses on the following statements made by the state in closing argument:

"The [defendant] is a violent, assaultive animal, [and] he engaged in that same behavior that he engaged it with Lisa Rambeck with Sarah Rambeck, and that * * * behavior caused [Sarah's] death.

"* * * * *

"We have, in the short slice of the Defendant's life that we know of that relates to this case, eight or nine or ten, whatever there are, violent, explosive, unprovoked incidents that are compatible with the actions of the killer of Sarah Rambeck[.]

"* * * * *

"In addition to the fact that there are a number of these violent and explosive episodes, when we look at the particulars of them further, we see similarities between what happened in them and what happened to Sarah Rambeck.

"* * * * *

"And isn't there a strong similarity between [the defendant grabbing Lisa Rambeck by the head] * * * and what happened to Sarah Rambeck that caused her skull fracture?"

As a general proposition, evidence admitted generally, without restriction, can be used by the jury for any purpose, even an improper one. *American Prod. Co. v. Marion Creamery Co.*, 214 Or 103, 112, 327 P2d 1104 (1958); *see also* Frank R. Lacy, *Evidence - 1959 Oregon Survey*, 39 Or Law Rev 19 (1960) ("Everyone knows that testimony offered and received without express limitation as to its use may be used by the trier of fact for any purpose that logic will permit.")

Moreover, the court's ruling did not foreclose defendant from objecting to the state's comments if they were otherwise improper. If the prosecutor's comments in closing argument were unduly inflammatory, defendant did not object to them at the time they were made, nor did defendant

move for a mistrial. A timely objection would have allowed the trial court to take appropriate action to correct any harm. *State v. Shafer*, 222 Or 230, 235, 351 P2d 941 (1960); *State v. Sims*, 105 Or App 318, 323, 804 P2d 1205, *rev den* 311 Or 433 (1991); *see also State v. Wilson*, 69 Or App 569, 687 P2d 800 (1984), *rev den* 298 Or 553 (1985) (*on the defendant's timely objection*, the trial court properly cured any prejudicial effect arising from the prosecutor's reference to the defendant as an "animal" during closing argument, where the trial court instructed the prosecutor to refrain from further use of that term in the presence of the jury and specifically instructed the jury that the arguments of counsel were not to be considered as evidence in the case). The majority premises its result on the proposition that closing argument was the first time that the jury could make improper use of the testimony of defendant's mistreatment of Rambeck and her friends. In this trial that had gone on for almost a month, the jury was left to consider that evidence for whatever it might have proven. The majority is simply wrong that this is the first time defendant could have been harmed by the evidence.

It is an unquestioned proposition of law that if unduly prejudicial events occur during a trial, failure to make a timely motion for a mistrial waives that error. It is a strange proposition then, when evidence is properly admitted and no limitation is requested at that time, that a month later the error may be preserved by a motion never before made. I believe that when evidence is properly admitted without limitation the trial court does not abuse its discretion in failing later to instruct the jury that it must limit the use of that evidence.

In summary, the evidence was admitted, over objection but without restriction. The evidence was properly admitted for at least one of the purposes for which it was offered. It was relevant to show why Rambeck reacted as she did toward defendant after Sarah's death. The trial court received testimony regarding defendant's physical and verbal mistreatment of Rambeck almost a month before defendant sought to limit its use by the state. The jury was left to consider the evidence and draw its own inferences during that time. The trial court had no obligation to grant defendant's untimely motion. In addition, defendant did not object

to the state's particular argument nor did he move for a mistrial.[4] Simply put, defendant did not preserve the alleged error, and should not now be heard to complain.

For these reasons I dissent.

---

[4] I express no comment as to the propriety of the prosecutor's argument.