Argued and submitted January 7, decision of Court of Appeals affirmed in part and reversed in part; judgment of the circuit court affirmed December 17, 1998

## STATE OF OREGON,
*Petitioner on Review /*
*Respondent on Review,*

*v.*

## GARY TODD STEVENS,
*Respondent on Review /*
*Petitioner on Review.*

(CC 10-92-10418; CA A85716; SC S44425, S44431)

970 P2d 215

Ann Kelley, Assistant Attorney General, Salem, argued the cause and filed the briefs for petitioner on review/respondent on review. With her on the briefs were Hardy Myers, Attorney General, and Virginia L. Linder, Solicitor General.

Stephen A. Houze, Portland, argued the cause and filed the briefs for respondent on review/petitioner on review.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, and Durham, Justices.**

GILLETTE, J.

** Fadeley, J., retired January 31, 1998, and did not participate in this decision; Graber, J., resigned March 31, 1998, and did not participate in this decision; Kulongoski, J., did not participate in the consideration or decision of this case.

## GILLETTE, J.

In this criminal case, defendant was charged with murdering an eighteen-month-old child. At trial, his theory of defense was that the death was caused by the child's mother, who also was his girlfriend. A jury convicted defendant. He appealed, arguing, among other things, that the trial court erred in permitting the state to present expert testimony that the mother suffered from a psychological condition known as Battered Woman Syndrome (BWS). Although the Court of Appeals rejected that and several other of defendant's assigned errors, it ultimately reversed the conviction and remanded for a new trial on two grounds: (1) the trial court erred in excluding evidence of the mother's prior assaults on her two other children; and (2) the trial court erred in denying defendant's motion to limit the state's use of certain evidence of defendant's prior "bad acts." *State v. Stevens*, 147 Or App 592, 938 P2d 780 (1997).

Both defendant and the state petitioned for review of the Court of Appeals' decision. The state challenges the reversal of defendant's conviction on the two grounds mentioned, while defendant adheres to his earlier arguments, including his argument that the trial court erred in permitting expert testimony regarding BWS. We allowed both petitions. We now conclude that none of the trial court rulings at issue constituted reversible error. Accordingly, we reverse, in part, and affirm, in part, the decision of the Court of Appeals and affirm the judgment of the circuit court.

At the time of the murder, defendant was staying with his girlfriend, Rambeck, and her three children in Rambeck's apartment. On the morning of May 8, 1992, Rambeck called 9-1-1 to report that she was unable to awaken Sarah, her youngest child. When emergency personnel arrived, they found that Sarah was dead, and had been for some time. Later, the medical examiner determined that Sarah had been beaten to death sometime between 9:00 p.m. and midnight the night before. Only two adults had been in the apartment with Sarah during that time period: Rambeck and defendant.

After Sarah's death, defendant moved out of the apartment. However, Rambeck continued to see defendant on a regular basis, against the advice of her family, friends, and attorney. Months later, when defendant was arrested and charged with intentional murder and murder by abuse of Sarah, Rambeck agreed to testify for the state.

From the beginning of the trial, the defense attempted to convince the jury that Rambeck, not defendant, was responsible for Sarah's death. In presenting its theory, the defense placed particular emphasis on Rambeck's allegedly "mellow" response to Sarah's death and her continuing relationship with defendant after the death.

Before trial, the state indicated that it intended to offer the expert testimony of Professor Klingbeil that Rambeck suffered from BWS. That evidence was relevant, the state argued, because it would offer an alternative explanation of Rambeck's state of mind, both with respect to her failure to recognize and report signs that Sarah was being abused physically before Sarah's death and her continued relationship with defendant after Sarah died. Without such testimony, the state contended, the jury erroneously might believe that the only reasonable explanation for Rambeck's conduct was that she, rather than defendant, was responsible for Sarah's death and earlier injuries.

Defendant moved to exclude the BWS testimony, arguing that: (1) Klingbeil lacked the training and expertise required to make what essentially was a medical diagnosis that Rambeck suffered from BWS, which, according to Klingbeil, is a variety of Post-Traumatic Stress Disorder; (2) Klingbeil's "diagnosis" of Rambeck would be nothing more in fact than improper profile evidence, *i.e.*, evidence that Rambeck fit the profile of a woman with BWS; and (3) Klingbeil's testimony would amount to a disguised opinion as to Rambeck's credibility. The trial court reserved its ruling on those issues until later in the trial, when the state could make an offer of proof.

At trial, Rambeck appeared as a witness for the state. She testified about her own and defendant's actions at the time of Sarah's death. Rambeck also testified that defendant had abused her physically. When Rambeck began to

describe particular instances of abuse, defendant objected that the evidence was unduly prejudicial and of questionable relevance, particularly when there had been no ruling on the admissibility of the state's BWS evidence. The trial court overruled the objection, noting that, regardless of the admissibility of BWS evidence, the defense had staked out its position—that Rambeck had killed the child—thus making the relationship between Rambeck and defendant, and its effect on the respective conduct of each, relevant.[1] Later, after hearing the state's offer of proof with regard to Klingbeil's BWS testimony, the trial court concluded that that evidence was admissible scientific evidence.

On appeal, defendant assigned error to both the foregoing rulings. Although he acknowledged that evidence of his physical abuse of Rambeck was relevant for a noncharacter purpose (to explain Rambeck's conduct), defendant argued that that evidence nevertheless should have been excluded, because its prejudicial effect outweighed its probative value. With respect to Klingbeil's testimony, he argued that, although general expert testimony about BWS is admissible as scientific evidence, certain aspects of Klingbeil's testimony, including her diagnosis of Rambeck as suffering from BWS, were not. The Court of Appeals rejected both arguments, concluding that Klingbeil's testimony satisfied the standard of admissibility for scientific evidence and that the necessity of laying a foundation for Klingbeil's testimony completely justified any evidence of defendant's physical abuse of Rambeck. *Stevens*, 147 Or App at 599.

In his petition for review, defendant reiterates the arguments that he made to the Court of Appeals with regard to the foregoing rulings. The state responds that both issues were resolved correctly by the Court of Appeals, and also contends that the argument concerning the admissibility of BWS evidence was not preserved and never should have been taken up on appeal. We begin with the latter point.

Before this court, defendant challenges Klingbeil's testimony on two grounds. He argues, first, that certain

---

[1] The trial court employed the same reasoning to admit testimony by third parties about defendant's abuse of Rambeck.

themes running through Klingbeil's testimony are not "relevant" or "helpful" to the trier of fact under the framework for considering the admissibility of scientific evidence set out in *State v. Brown*, 297 Or 404, 687 P2d 751 (1984), because, among other things, those themes are not supported by current research.[2] In that regard, defendant focuses on three aspects of Klingbeil's testimony: (1) her general assertion that BWS is diagnosable and her specific diagnosis of Rambeck as suffering from BWS; (2) her presentation of theories of "learned helplessness" and the "cycle of violence" to explain why battered women behave as they do; and (3) her assertion that BWS is a "subset" of Post-Traumatic Stress Disorder.[3] In addition to those specific concerns, defendant argues that the testimony as a whole was unfairly prejudicial, because there was a substantial risk that it would mislead or, at least, be given undue weight by, the jury.

As noted, the state asserted that defendant had not preserved his arguments. The Court of Appeals' majority, however, concluded that defendants' arguments to the trial

---

[2] In *Brown*, this court held that scientific evidence is admissible if it meets three criteria: (1) It must be "relevant," OEC 401; (2) it must be "helpful" to the trier of fact, OEC 702; and (3) its probative value must not be substantially outweighed by its potential for unfair prejudicial effect, confusion, or delay, OEC 403. To determine the relevance or probative value of proffered evidence, seven factors are to be considered:

"(1) The technique's general acceptance in the field;

"(2) The expert's qualifications and stature;

"(3) The use which has been made of the technique;

"(4) The potential rate of error;

"(5) The existence of specialized literature;

"(6) The novelty of the invention; and

"(7) The extent to which the technique relies on the subjective interpretation of the expert."

*Brown*, 297 Or at 417. As this court later stated in *State v. Lyons*, 324 Or 256, 271, 924 P2d 802 (1996):

"The *Brown* factors were not intended to be exclusive, nor were they intended to be taken as a mechanical checklist of foundational requirements. What is important is not lockstep affirmative findings as to each factor, but analysis of each factor by the court in reaching its decision on the probative value of the evidence under OEC 401 and OEC 702."

[3] Notably, defendant appears to concede that some BWS testimony—in particular, testimony about the characteristics of battered women—would satisfy the requirements of *Brown*.

court had been sufficient to preserve the issue of the admissibility of BWS testimony as scientific evidence. The majority held that, regardless of any failure to assert a particular *argument* or *source of law*, plaintiff had satisfied the preservation requirement by raising, at trial, the general *issue* of BWS as scientific evidence. *Stevens*, 147 Or App at 596.

■     This court has held that, for purposes of preserving error, it is essential to raise the relevant issue at trial, but less important to make a specific argument or identify a specific legal source with respect to the issue raised. *State v. Hitz*, 307 Or 183, 188, 766 P2d 373 (1988). Although that principle imparts some degree of liberality to the preservation requirement, it does not transform that requirement into a cursory search for some common thread, however remote, between an issue on appeal and a position that was advanced at trial. Instead, in considering whether an objection at trial raised the "issue" being advanced on appeal, an appellate court must view the facts in light of the purposes of fairness and efficiency that underlie the requirement.

In the present case, the state gave notice before trial that it intended to offer testimony pertaining to BWS and agreed to submit a brief on the issue. The state submitted its memorandum early in the trial. In that memorandum, the state outlined the BWS phenomenon, including the theories of "learned helplessness" and the "cycle of violence," as those ideas were described in the literature. It also acknowledged that it was required to lay a foundation establishing the admissibility of the proffered testimony as scientific evidence pursuant to the *Brown* framework. Finally, the state appended cases and materials that included discussions relevant to the seven-factor *Brown* inquiry and argued that the testimony that it proposed to offer would be admissible under *Brown*.

Later, the state made an offer of proof by orally examining its designated expert, Klingbeil. Klingbeil described her credentials and her method of diagnosing BWS. She also testified that the field of psychiatry generally has accepted BWS as a diagnosis (with acceptance occurring through an evolutionary process over the course of 20 to 25

years), that her diagnostic method is accepted in the psychological community, and that diagnosis of BWS involves no greater rate of error than any other psychiatric or psychological diagnosis. Finally, Klingbeil described the syndrome itself and her findings with respect to Rambeck.

Defendant objected to Klingbeil's testimony, both orally (following the state's offer of proof) and in writing, arguing that Klingbeil's testimony was "mere quasi psychiatric or psychological evidence, which is really nothing more than profile evidence," that it impermissibly commented on a witness' credibility, and that Klingbeil was not qualified to make a psychological diagnosis. Although defendant's written objections *did* make general reference to the seven-factor test for admissibility of scientific evidence set out in *State v. Brown*, they raised no *issue*, as contemplated by *Hitz*, regarding the admissibility of Klingbeil's testimony as scientific evidence. Of particular relevance here, defendant never objected to the state's evidence regarding the general acceptance of BWS as a diagnosis, its 25-year history, the wide judicial usage of BWS evidence, or the rate of error involved in BWS diagnosis.

Despite the foregoing, the Court of Appeals concluded that defendant's objections at the trial level were sufficient under *Hitz* to preserve the argument that he now wishes to pursue, because, in that court's view, they raised the general *issue* of the admissibility of BWS as scientific evidence. However, we are not persuaded that, under the circumstances described, defendant satisfied the *Hitz* standard.

Defendant offered extremely narrow objections to Klingbeil's testimony. Those objections did not assert that the state had failed to satisfy the applicable criteria for admission of that testimony as scientific evidence. By calling Klingbeil's testimony "quasi psychiatric or psychological evidence," defendant sought to persuade the trial court that the testimony was inadmissible *profile* evidence, not that it was inadmissible as scientific evidence. The trial court was entitled to be told that, in defendant's view, it was committing error by admitting evidence that did not satisfy the legal standards applicable to scientific evidence. No such objection was made. Permitting review under such circumstances, on

the theory that defendant's objections raised the general "issue," would represent an abandonment of the preservation requirement, as discussed in *Hitz*, and the purposes that it serves.

We are satisfied that defendant's arguments pertaining to the relevance and helpfulness of Klingbeil's testimony under the *Brown* analysis were not preserved at trial. We therefore do not consider them.

■ The foregoing comments do not apply to defendant's present contention that the probative value of Klingbeil's testimony was substantially outweighed by its prejudicial effect. Defendant did articulate that objection at trial. In particular, he argued (as he does now) that there was a grave danger that the jury would overvalue or be misled by Klingbeil's testimony. We consider that issue.

As noted, defendant contends that Klingbeil's testimony would tend to "snow" the trier of fact—that "there is a very real likelihood that the jury simply accepted her analysis of the dynamics of defendant's relationship with Lisa Rambeck." We are not persuaded. There is nothing about Klingbeil's testimony that would have any greater tendency than that of any other expert to invade the province of the jury. Although it is true that jurors may tend to give significant weight to the testimony of experts, expert testimony, like any other evidence, is open to rebuttal. Defendant points to nothing that would make Klingbeil's testimony any more persuasive than that of any other qualified expert. We reject defendant's argument that Klingbeil's testimony was unduly prejudicial.

■ Defendant's second assignment of error pertains to the admission of evidence of specific instances of his physical abuse of Rambeck. Defendant correctly notes that such "other wrongs" evidence is admissible only if: (1) it is independently relevant for a noncharacter purpose; (2) it is supported by sufficient proof; and it passes the balancing test of OEC 403, that is, its probative value is not substantially outweighed by its potential negative effects. OEC 404(3).[4] *See*

---

[4] In 1997, the legislature enacted OEC (4), which purports to make admissible in criminal actions relevant "eviden- other crimes, wrongs or acts by the

*also State v. Hampton*, 317 Or 251, 254, 855 P2d 621 (1993) (stating and applying test); *State v. Johnson*, 313 Or 189, 195, 832 P2d 443 (1992) (same). With respect to the challenged evidence, defendant concedes the first two requirements—that it has independent relevance and is supported by sufficient proof—are met here. He argues, however, that the evidence should have been excluded pursuant to the balancing test of OEC 403—that, when balanced against its limited value to the state's case, the evidence was too prejudicial, too distracting, and too time-consuming.

■     For purposes of the foregoing argument, defendant suggests that evidence of abuse was relevant only as foundation evidence for later expert BWS testimony and, consequently, that testimony about specific instances of abuse was unnecessary and of slight probative value:

> "[T]here was no need for the testimony of Rambeck or third parties concerning specific incidents, because the jury had already heard testimony that Rambeck had been physically abused by Defendant. The latter testimony was sufficient to lay a foundation for the subsequent expert testimony on battered women.
>
> "* * * * *
>
> "* * * The important testimony with respect to Rambeck's state of mind was the expert testimony concerning battered women, and not the foundational evidence of battering."

Defendant also appears to suggest that the trial court had an independent responsibility to decide, *sua sponte*, which evidence of abuse, and how much, was sufficient to fulfill the permissible noncharacter purposes for which it was offered.

Neither suggestion is correct. Although evidence of abuse was admissible for the foundational purpose that defendant identifies, it also was admissible for at least one other noncharacter purpose—to explain Rambeck's conduct and state of mind independent of Klingbeil's testimony. The

defendant," with exceptions that do not apply here. Or Laws 1997, ch 313, § 29. The legislature directed that that statute "apply to all criminal actions pending or commenced on or after December 5, 1996." Or Laws 1997, ch 313, § 38. Neither party has argued that the enactment of OEC 404(4) applies to this case.

state was entitled to rebut the defense's suggestions regarding Rambeck's conduct and motives, not only by offering Klingbeil's diagnosis, but also by setting out direct evidence that helped to explain the dynamics of Rambeck's relationship with defendant, so that the jury could draw its own conclusion about the meaning of Rambeck's conduct. Viewed in that light, we do not accept defendant's low valuation of the evidence at issue. Whether or not it was essential as a foundation for Klingbeil's testimony, Rambeck's testimony about individual instances of abuse lent significant credibility and force to her own testimony and to the state's theory that lengthy abuse by defendant had influenced her behavior. And, because it supports that theory, third-party testimony about specific instances of abuse also had significant probative value.[5]

In short, we do not agree with defendant's conclusion that the evidence at issue had little probative value. Moreover, although we agree with defendant that the evidence was potentially prejudicial, it was not unfairly so, in light of the fact that defendant's own trial strategy opened the door to its admission. In short, we hold that the trial court was within the range of discretion granted to it in concluding that, on balance, the evidence was more probative than prejudicial.

Defendant argues that *State v. Hansen*, 304 Or 169, 743 P2d 157 (1987), supports his position that evidence of specific acts of abuse are inadmissible in these circumstances. In *Hansen*, a child sex-abuse case, the court held that expert testimony offered to explain a child's denial of the alleged abuse could not include testimony regarding the "grooming" techniques used by child abusers. The court explained that testimony pertaining to the typical responses of sexually abused children

---

[5] Defendant also points to some evidence that was admitted under the same general theory that cannot, in his estimation, be justified as evidence going to Rambeck's state of mind. In particular, there was testimony that defendant had assaulted a friend of Rambeck's whom defendant perceived as meddling in his relationship with Rambeck and testimony about a threat that defendant had made against Rambeck to a third party. Although that evidence presents a closer question, we ultimately are persuaded that it, too, was probative, because it added credibility to the state's general theory that Rambeck's responses were shaped by the fact that she was operating under a constant threat of abuse from defendant.

"arguably is admissible * * * because it might assist the trier of fact to understand the student's initial denial. But the specific techniques used by some child abusers 'to get close to the victim,' which may result in the child's emotional dependence on the abuser, are irrelevant to the effect the dependence has on the child's willingness to implicate the abuser. It is the emotional dependence, not the specific acts that produce it, that helps to explain the child's behavior."

304 Or at 176. Defendant maintains that the foregoing passage controls the present issue, *i.e.*, that the fact that Rambeck's state of mind was relevant did not make the specific acts that produced that state of mind relevant.

Although *Hansen* indicates that testimony that describes the process of victimization may be inadmissible in some circumstances, either because it is irrelevant or unduly prejudicial, that case does not hold that such testimony is, in all circumstances, inadmissible. *Hansen* involved the testimony of an expert who purported to explain the seemingly abnormal responses of a certain class of victims to a particular type of criminal behavior. In general, such experts can and must do so without providing details of the victimization process: Those details are irrelevant to the expert's subject matter and, as such, rarely will pass the balancing test of OEC 403. The same is not true when a victim is put on the stand to explain, among other things, the effects of *her own* victimization on *her* behavior with respect to the defendant.

In conclusion, we hold that the evidence pertaining to defendant's abuse of Rambeck was admissible. The trial court did not err in admitting it.

We turn now to the procedural facts that are relevant to a third set of issues, having to do with defendant's various attempts to place certain of Rambeck's actions before the jury. As previously noted, defendant's primary trial strategy was to convince the jury that there was a substantial probability that Rambeck, not defendant, had killed Sarah. In support of that theory, defendant hoped to introduce evidence suggesting that Rambeck physically had abused her two other children on at least two occasions before Sarah's death. In particular, defendant attempted to offer testimony

of former neighbors regarding: (1) an incident that occurred in 1989, in which screaming and noise from Rambeck's apartment led a neighbor to believe that Rambeck had shaken her oldest daughter, then 18 months old, and thrown her into her crib or against a wall; and (2) an incident that occurred about a month before Sarah's death, in which Rambeck was observed "screaming and cussing" at her two older children while slapping their heads and pulling their hair.

Defendant attempted to offer the foregoing evidence at three different points in his trial and was rebuffed by the trial court in three separate rulings. The Court of Appeals concluded that two of those rulings were correct, but ultimately held that the trial court should have admitted the evidence during the cross-examination of Klingbeil, the state's BWS expert. *Stevens*, 147 Or App at 603-04. The state argues that the Court of Appeals erred in reversing the trial court on that point, while defendant challenges the trial court rulings barring his use of the evidence in his case-in-chief or in his cross-examination of Rambeck. We consider defendant's challenges first.

■ Regarding his offer of evidence during his case-in-chief, defendant acknowledges that evidence that Rambeck had attacked her older children is "other wrongs" evidence that, under OEC 404(3), is admissible only if it is relevant for a noncharacter purpose. He argues, however, that the evidence is relevant for three noncharacter purposes: (1) to establish the identity of Sarah's killer based on *modus operandi*; (2) to establish the intent of Sarah's killer; and (3) to provide a complete account of the crime.

■ With respect to the first identified purpose, defendant notes, correctly, that evidence of other wrongs is admissible to establish identity if the occurrences share an identifiable *modus operandi*—that is, if there is a high degree of similarity between the present charge and the past conduct and both involve a distinctive methodology. He argues that the testimony regarding the 1989 incident passes that test: that that incident and Sarah's murder are similar, and distinctively so, in that both involved violent physical attacks on an 18-month-old female child in the vicinity of the child's crib.

The state responds that the two incidents are not similar in any way that could assist in identifying the killer. Although it acknowledges that, like Sarah, the "victim" in the 1989 incident also was an 18-month-old female, the state maintains that the similarity between the incidents ends there—that, contrary to defendant's characterization, there is no evidence that Sarah was killed in or near her crib or that the 1989 incident involved anything approaching the magnitude of violence that resulted in Sarah's death. We agree. This is not the level of distinctiveness and similarity that can establish a *modus operandi*.

■ Defendant also argues that his proffered evidence was admissible to show the intent of Sarah's killer. In so arguing, defendant draws on the suggested six-factor analysis in *State v. Johns*, 301 Or 535, 725 P2d 312 (1986), which states:

> "[I]n evaluating prior crime evidence on the issue of intent or absence of mistake, the trial judge should make these determinations:

> "(1) Does the present charged act require proof of intent?

> "(2) Did the prior act require intent?

> "(3) Was the victim in the prior act the same victim or in the same class as the victim in the present case?

> "(4) Was the type of prior act the same or similar to the acts involved in the charged crime?

> "(5) Were the physical elements of the prior act and the present act similar?

> "(6) If these criteria are met, is the probative value of the prior act evidence substantially outweighed by the danger of unfair prejudice, confusion of issues or misleading the jury, undue delay or presentation of cumulative evidence?"

*Id.* at 555-56. Defendant argues that, when analyzed in terms of those six factors, his evidence of Rambeck's earlier treatment of her children is admissible as evidence going to intent.

Again, we disagree. Defendant is attempting to squeeze the present circumstance into an analysis for which

that analysis was not designed. The state did not charge Rambeck with any crime, and her intent is not relevant to defendant's defense.[6] The fact that the charges against *defendant*—intentional murder and murder by abuse—require proof of intent *by him* has no bearing on whether *Rambeck*'s prior bad acts are admissible.

■    Defendant's final claim in this regard is that Rambeck's treatment of her other children is necessary to "complete the picture." Defendant contends that exclusion of that evidence permitted the state to create a false impression that Rambeck was a mild and compassionate mother. We agree with the state, however, that the two events at issue are such that their admission cannot be justified under defendant's theory. The only picture that they can "complete" is that of defendant's version of Rambeck's *character*. As such, they fall within the category of evidence that is prohibited by OEC 404(3).

■    Defendant also argues that, because the events were within the general subject matter of her direct testimony in the state's case-in-chief, he should have been permitted to cross-examine Rambeck about the two events.[7] In that regard, defendant suggests that Rambeck's direct testimony involved statements about the "inter-personal dynamics of her household," including her behavior and attitudes toward her children.

Defendant's characterizations of the testimony aside, we find nothing in Rambeck's statements that would justify a cross-examination along those lines. Although Rambeck did describe some aspects of her relationship with *Sarah*, and did describe certain differences in her children's behavior, she did not discuss her treatment of her two older children or her relationships with them. Thus, even if we

---

[6] The essence of that defense is that Rambeck killed Sarah. If accepted, that defense would be valid *regardless* of whether Rambeck *intended* to cause Sarah's death.

[7] Defendant contends that OEC 611(2) provides the correct framework for deciding this point. OEC 611(2) relates to the scope of cross-examination and provides, in pertinent part:

"Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness."

were to agree with the general proposition that inquiry into those matters on cross-examination would be proper if Rambeck's direct testimony had opened the door, that door was not opened.

■        Defendant's third attempt to place the two instances of mistreatment before the jury—in his cross-examination of Klingbeil—also was unsuccessful in the trial court. However, the Court of Appeals disagreed with the trial court's ruling in that regard and reversed. Consequently, it is the state, rather than defendant, that now seeks review of that issue. Before we consider the parties' arguments in that regard, we review the relevant facts.

As previously discussed, the state examined Klingbeil extensively about BWS and her diagnosis of Rambeck in an offer of proof. During that offer of proof, Klingbeil explained BWS, offered her diagnosis that Rambeck suffered from BWS, and testified that BWS might explain Rambeck's failure to report signs that Sarah was being abused or to suspect defendant's involvement in the death. Also during that offer, defendant cross-examined Klingbeil about "pecking order battering" (POB)—a theory that some women who suffer from BWS respond to repeated battering by, in turn, battering others lower in the family hierarchy. After Klingbeil explained the phenomenon, defendant briefly described the two events at issue and asked if knowledge of those events would change Klingbeil's diagnosis. Klingbeil responded that it would not—that the events described had nothing to do with Rambeck's relationship with defendant. Klingbeil also agreed that, depending on the circumstances, irritability, outbursts of anger, and POB itself might be "included in" a BWS diagnosis.

Later, after the state offered Klingbeil's testimony before the jury and defendant began to cross-examine on the issue of POB, the state intervened, suggesting that Klingbeil's responses during the offer of proof had established that that line of questioning was irrelevant. After hearing oral argument on the matter, the court concluded that, although defendant properly could elicit testimony from Klingbeil that persons suffering from BWS sometimes engage in POB (with an explanation of what that was), he could not use Klingbeil's

testimony to "bootstrap" testimony about Rambeck's conduct toward her older children into the case. At that, defendant announced that he was inclined to avoid the whole area of POB.

On appeal to the Court of Appeals, defendant assigned error to the trial court's ruling precluding inquiry into the import of specific instances of Rambeck's mistreatment of her older children. The Court of Appeals rejected the state's contention that defendant had waived that objection by not pursuing the issue before the jury and concluded, on the merits, that the attempted inquiry was responsive to the testimony on direct and admissible under OEC 404(3).[8] The Court of Appeals held:

> "The trial court erred when it reasoned that the evidence of specific instances of misconduct was inadmissible under OEC 404. In particular, OEC 404(3) allows evidence of specific instances of bad conduct as proof of an actor's intent or state of mind. In this case, the state put Rambeck's state of mind in issue by introducing the BWS testimony to refute defendant's claim that Rambeck was the perpetrator of the crime and to explain what otherwise could be considered incriminating conduct. Defendant was entitled to elicit evidence on cross-examination of Klingbeil that would affirmatively support his contrary position."

*Stevens*, 147 Or App at 604.

In its petition for review, the state argues that the Court of Appeals explanation reflects a misunderstanding of the "state of mind" exception at OEC 404(3), as well as an inconsistent approach to the use of "other wrongs" as substantive evidence. With regard to the latter point, the state maintains that the evidence at issue ultimately was being

---

[8] In his dissent, Judge Warren concluded that defense counsel had acquiesced in the trial court's ruling and therefore had waived any objection. *Stevens*, 147 Or App at 613 (Warren, P. J., dissenting). However, we agree with the Court of Appeals majority that, when the relevant colloquy is examined in its entirety, defense counsel's statements do not suggest a waiver. In particular, the defense was told, in no uncertain terms, that it would not be permitted to question Klingbeil about specific instances of behavior that might tend to suggest POB. Neither is counsel's failure to make an offer of proof at that point dispositive, because the material at issue had been covered in defendant's cross-examination of Klingbeil during the state's offer of proof and was well understood by the court and opposing counsel.

offered only to show propensity and that the fact that it was being offered through cross-examination of an expert should not change the OEC 404(3) analysis. Defendant responds that the state is missing the point—that Klingbeil had suggested that Rambeck's conduct reflected a particular state of mind and the evidence was being offered to rebut that suggestion, *i.e.*, to show that Rambeck's state of mind at the relevant time was not as Klingbeil's testimony suggested. Thus, defendant argues, in this particular context, the evidence was not offered to show Rambeck's propensity to assault her children physically but, instead, for the independent, noncharacter purpose of showing that Rambeck did not necessarily have the state of mind characteristic of those suffering from BWS.

■ ■ We agree with defendant that Klingbeil's testimony explored aspects of Rambeck's state of mind both before and after Sarah's death. We also agree that, once an issue is raised on direct examination, it is fair game on cross-examination, even to the extent of inquiring into a different set of facts than those that were elicited on direct. *See Ritchie v. Pittman*, 144 Or 228, 231, 24 P2d 328 (1933) (cross-examination "should not be limited to the exact facts stated on the direct examination, but [may] extend[ ] to other matters which tend to limit, explain, or qualify them, or to rebut or modify any inference resulting therefrom, provided they are directly connected with the matter stated in the direct examination"). However, the cross-examiner's right to elicit peripheral facts is subject to OEC 404. The question thus becomes whether, in this particular case, defendant's intended use of the evidence was for a noncharacter purpose. As noted, defendant argues that it was—that it was offered to show Rambeck's state of mind, *i.e.*, to rebut the state's evidence on that point.

The difficulty with defendant's argument lies not in what it purportedly addressed. Rambeck's state of mind, and Klingbeil's impressions of it, already were at issue. Instead, the difficulty lies in the only way that, on this record, defendant could demonstrate any connection between the incidents involving Rambeck's children and the death of Sarah.

He could not offer it in direct impeachment of Klingbeil's testimony or her diagnosis, because it had been established during the state's offer of proof that Klingbeil would testify that knowledge of the two incidents would not alter her opinion. Defendant could have offered it for impeachment in an indirect sense, if he had had an expert of his own who would have testified either that knowledge of those two incidents should alter a diagnosis or that the two incidents would be used by a competent professional in determining whether Rambeck was affected, for example, by POB. But defendant had no such expert witness.

Absent the foregoing justifications for offering the evidence during the cross-examination of Klingbeil, defendant's only other justification would be to use evidence of the two incidents substantively to establish an alternative hypothesis for Rambeck's state of mind. But the syllogism that defendant would be setting up with that evidence would not be permissible. It would have to go like this: On two separate occasions in the past, Rambeck abused her older children. Therefore, Rambeck is a child abuser. Sarah was Rambeck's child. Sarah is dead, and Rambeck, the abuser of the other children, had the opportunity to commit the crime. Rambeck acted in accordance with her propensity to hurt her children and killed Sarah.

In fact, counsel for defendant acknowledged during a colloquy with the trial court that he was seeking to have the jury draw that inference. Counsel's candor is commendable, but only confirms that what defendant was offering was evidence of prior bad acts that was inadmissible under OEC 404. The contrary conclusion of the Court of Appeals was error.[9]

Ultimately, then, we agree with the trial court that defendant's bid to inquire about Rambeck's wrongs toward her other children could not be bootstrapped into the case on the theory that they showed Rambeck's "state of mind." The

---

[9] Defendant might argue, of course, that our characterization of the issue is too narrow—that the evidence of Rambeck's other wrongs speaks directly to Rambeck's state of mind *vis-a-vis* her children. But even if Klingbeil's testimony had opened up that quite different issue—and it did not—defendant still would be trying to use the evidence of particular bad acts for the impermissible purpose of showing that Rambeck had a particular propensity and that she had acted in conformance therewith.

only relevance that defendant's proffered evidence had was in placing before the jury an indirect and impermissibly propensity-based inference. The Court of Appeals erred in concluding otherwise.

We turn to the second issue raised in the state's petition and the final issue in this case. That issue pertains to the trial court's denial of the following defense motion:

> "Comes now the defendant * * * and hereby moves the Court for an order limiting the state from arguing that the Defendant's actions towards * * * Rambeck can be viewed as evidence that Defendant has a propensity towards violence and is therefore more likely to have injured or killed Sarah Rambeck."

The motion was filed just before final arguments. The trial court denied it, stating:

> "[The testimony regarding defendant's abuse of Rambeck] didn't come in with any restrictions, such as an impeachment or something like that. It's evidence in the case to prove a particular thing. If it proves something else, so be it. Motion will be denied."

On appeal, defendant argued that the denial of his motion permitted the state to make an extended and improper argument regarding his propensity toward violence.

The Court of Appeals interpreted defendant's motion as a request for a limiting instruction to the jury under OEC 105.[10] That evidentiary rule provides:

> "When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly."

In concluding that denial of defendant's motion was improper, the Court of Appeals noted that OEC 105 does not impose any temporal requirement and that, under that rule,

---

[10] The court stated: "Defendant's motion is tantamount to a request for a limiting instruction to the jury. If granted, it would have restricted the use of the evidence by the parties in argument and by the jury in it deliberations." *Stevens*, 147 Or App at 605.

if a defendant requests a limiting instruction, the trial court has no discretion to deny it. The majority explained:

> "Our research does not reveal any Oregon cases interpreting when a defendant must ask for a limiting instruction. However, federal law provides some guidance in interpreting the rule. OEC 105 is identical to Rule 105 of the Federal Rules of Evidence (FRE). OEC 105 Commentary (1981). In *Lubbock Feed Lots, Inc. v. Iowa Beef Processors*, 630 F2d 250, 266 (5th Cir 1980), the court held under FRE 105 that
>
>> " '[o]nce the court determines that such evidence should be admitted, however, it cannot refuse a requested limiting instruction. * * * Although generally more effective at the time the evidence is presented, limiting instructions may be requested and given as part of the court's final instructions to the jury." (Citations omitted; emphasis supplied.)
>
>> "*See also* Jack B. Weinstein & Margaret A. Berger, 1 *Weinstein's Evidence*, ¶ 105[05] (1996) (suggesting that it is a better practice to give limiting instructions as the evidence is received but acknowledging that they may be given at the end of trial)."

*Stevens*, 147 Or App at 606.

In challenging that decision, the state argues that it was improper to construe defendant's motion as a request for a limiting instruction to the jury, particularly when defendant had not assigned error to the trial court's denial of defendant's actual and express request for a limiting instruction on the same general theme. The state also argues that an anticipatory motion to limit arguments is not an adequate substitute for the contemporaneous objections that generally are required to preserve a claim that a party's argument was impermissible. Finally, the state argues that, with the exception of one statement, the state's closing arguments did not rest on propensity theory and were not objectionable.

■ We agree with the first argument—that the Court of Appeals erred in first turning defendant's motion into a request for a limiting instruction and then, having so construed it, finding error in the trial court's failure to give that instruction. With respect to the first point, litigants are

treated as meaning what they say. A trial court may have some discretion to interpret a motion, but it cannot be faulted for failing to recognize a motion as one for a *limiting* instruction, when the motion has been designated by its proponent as having an entirely different purpose and effect.

■ The foregoing leads us to conclude that, if error exists here, it must exist because defendant's motion is well taken when considered at face value. However, that brings us to the state's second argument—that, at least for purposes of preserving error, an anticipatory motion to limit a party's arguments simply is not a device that is so workable that prejudicial error can be predicated on a trial court's failure to allow it. We agree that the trial court is not so circumscribed. Even if a trial court properly *can* limit a party's use of evidence in argument and may choose to do so before argument begins, the trial court cannot be *forced* to shoulder a responsibility (that normally would fall to a party) of monitoring the opposing party's arguments. In terms of the present case, that means that, regardless of whether, on the showing made, the trial court *could* have allowed defendant's motion to limit argument, it did not *have to* do so. Defendant's subsequent failure to offer *contemporaneous* objections to the allegedly offending arguments therefore waived the issue.

■ Finally, the state's arguments aside, we are persuaded that the challenged ruling was justified by the explanation that the trial court offered at the time. In that regard, we note that the trial court stated that the evidence at issue had come in, as far as it was concerned, without restriction. In essence, that statement conveyed the trial court's view that the time for seeking a limitation on the use of the evidence in question had passed. We agree that the trial court's ruling was within the range of discretion that the court is allowed in such circumstances.

The authorities cited by the Court of Appeals to support its contrary conclusion that a limiting instruction that is requested at a later point *must* be honored are not to the contrary. For example, the Court of Appeals cites a number of cases and treatises concerning the federal equivalent of OEC 105 for the general proposition that limiting instructions *can* be *given* as part of the court's final instructions to the jury.

*Id.* However, those materials do not speak to the issue at hand, *viz.*, whether a later request for a limitation *must* be honored, although the evidence was admitted without restriction and no request for limitation was made contemporaneously with that event.

■ The Court of Appeals also relied on the fact that OEC 105 contains no express temporal requirement. However, objections to the admission of evidence for one or more particular use falls within the general rubric of OEC 103(1)(a), which requires that "a *timely* objection or motion to strike appear[ ] on the record, stating the specific ground of objection," before error will be considered prejudicial.

■ Timeliness, in this context, as in almost any context in which the admissibility of evidence is at issue, means at or before the time that the evidence is offered to the jury. At the very least, it must occur at a time when the trial court is able to take appropriate action to mend the harm. *See State v. Shafer*, 222 Or 230, 235, 351 P2d 941 (1960) (illustrating point). Here, the defendant waited until nearly a month after the evidence was admitted, without restriction, before he filed his motion. During that period, the state was left to labor under the impression that the evidence had been admitted for any purpose and set its strategy accordingly. To suggest, as does the Court of Appeals' majority, that the trial court committed reversible error in failing to treat defendant's motion as timely ignores the realities of litigation.

For the reasons stated, we conclude that, regardless of how it is designated, defendant's motion to limit the use of evidence of his abuse of Rambeck properly was denied. The Court of Appeals erred in ruling otherwise.

In conclusion: We reject, as unpreserved, defendant's challenge to the admission of Klingbeil's testimony. We also reject defendant's contentions that evidence of his physical abuse of Rambeck was admitted erroneously and that evidence of Rambeck's treatment of her older children was excluded erroneously in the context of his cross-examination of Rambeck and his case-in-chief. The Court of Appeals correctly affirmed the trial court's rulings on those issues. We hold that the two other parts of the Court of Appeals' decision—its conclusions that inquiry into specific

instances of Rambeck's treatment of her older children was admissible in defendant's cross-examination of Klingbeil and that defendant's motion to limit use of evidence of his own abuse of Rambeck was erroneously denied—were erroneous.

The decision of the Court of Appeals is affirmed in part and reversed in part. The judgment of the circuit court is affirmed.