Argued and submitted October 29, 1999, reversed and remanded June 7, respondent's petition for reconsideration filed June 29, and appellant's response filed July 5 allowed by opinion August 30, 2000
See 169 Or App 469 (2000)

STATE OF OREGON,
*Respondent,*

*v.*

RAYMOND PATRICK OGDEN,
*Appellant.*

(109704562; CA A99667 (Control))

STATE OF OREGON,
*Respondent,*

*v.*

RAYMOND PATRICK OGDEN,
*Appellant.*

(159701214B; CA A99740)
(Cases Consolidated)

6 P3d 1110

Robin A. Jones, Deputy Public Defender, argued the cause for appellant. With her on the brief was David E. Groom, Public Defender.

Ann Kelley, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before De Muniz, Presiding Judge, and Haselton and Wollheim, Judges.

DE MUNIZ, P. J.

**DE MUNIZ, P. J.**

Defendant appeals his convictions on four counts of coercion. ORS 163.275. On appeal, defendant argues, *inter alia*, that the trial court erred in admitting expert testimony about battered women syndrome (BWS) and the "lethality assessment." We reverse and remand.

On appeal from a conviction, we recite the facts in the light most favorable to the state. *State v. Rose*, 311 Or 274, 276, 810 P2d 839 (1991). Defendant and complainant began a relationship in 1989 and had a child. Defendant was jealous and abusive. Complainant obtained a restraining order that she later withdrew. Complainant moved to California to get away from defendant. At some point, she returned to Oregon. Early in 1997, complainant contacted defendant to offer her condolences over the death of his mother. The two agreed to meet at complainant's apartment on January 11, 1997. When defendant arrived, complainant was not there. Defendant jimmied her apartment door with a screwdriver, breaking the lock in the process, then left. When complainant returned later that evening, defendant was waiting for her in the parking lot. He followed her into the apartment and confronted her about where she had been.

On January 26, again at complainant's apartment, defendant continued to accuse her of seeing another man two weeks earlier. Defendant rejected complainant's explanation, even after calling a taxi-cab company to confirm her story. Growing increasingly angry, defendant cornered complainant in her living room, refusing to allow complainant to leave the apartment to purchase cigarettes. When defendant eventually left the apartment, he told complainant that, if she called the police, "he would get right back out of jail and he would hunt [her] down."

In early February, after more threats and intimidation by defendant, complainant reported defendant to the police and obtained a restraining order. According to complainant, defendant "never complied with the order."[1] Shortly

---

[1] Defendant does not appeal from his convictions on five counts of contempt, ORS 33.015 *et seq.*, for violating the restraining order.

thereafter, the police arrested defendant for making phone calls to and visiting complainant in violation of the order. However, complainant declined to press charges because defendant agreed to enter anger management classes.

In spite of his arrest, defendant continued to violate the restraining order. In one instance, while helping complainant move to a new apartment, defendant grabbed her, tore up a photograph, and destroyed other property. He also made complainant handle drugs so that her fingerprints would be found on the container. When complainant hid the drugs, defendant poked her with a steak knife and swung the knife at her neck until she returned them. Even after two hearings in March 1997, concerning further violations of the restraining order, defendant continued to make frequent phone calls and visit complainant. Complainant testified that "[i]t didn't matter if I said no to him, he was coming over anyways [sic]. Sometimes it was better if I just said yes, more times than not it was."

At the end of April, defendant informed complainant that he had contracted hepatitis. Complainant allowed him to spend the night at her apartment; however, when she refused to have sex with him, he grew angry. Defendant took the cordless phone so complainant could not call the police. He then backed her against the bedroom wall and repeatedly punched at her face with his fist, stopping just short of hitting her each time. When complainant asked permission to leave the room, defendant followed her. In the living room, he told her that she was his prisoner and, grabbing her arms, pulled her from the futon where she was seated. After berating her for several hours, defendant left.

On May 4, approximately one week later, complainant told defendant that a male friend had offered her a job. Defendant grew jealous and angry and struck complainant twice on the nose with a hairbrush. She grew frightened. Previously, defendant had told her that he would just kill her instead of hitting her because he would get in the same amount of trouble either way. Complainant went into her kitchen and defendant followed her, holding a butcher's knife. When she attempted to call for help, defendant closed

the blinds. He then put the knife down in front of complainant and told her to stab him, or he would stab her.

The two continued to argue. At some point, defendant called the man that had offered complainant a job, accusing him of various things. When the man called back, complainant handed the phone to defendant and attempted to leave the apartment. Defendant caught her at the top of the stairs and kicked her in the ribs, causing her to fall down the entire flight of stairs. Two days later, a doctor diagnosed rib contusions.

Complainant refused to see or speak with defendant for several days. However, he continued to call and stop by her apartment. On Mother's Day, complainant agreed to meet defendant in a public place to see a movie. Defendant came to her apartment instead, where he fell asleep. Later, when complainant went out to the store, defendant got up and followed her. At the store, defendant insisted on taking complainant to a late movie. Afterwards they returned to her apartment. In the morning, when complainant told defendant he had to leave, he grew angry and refused. When complainant's son returned to the apartment from his grandparent's house, defendant demanded that complainant get someone to come by to pick up the child. Complainant had her sister come get the boy because she did not want him around while defendant was in such an angry state.

Defendant then said he wanted complainant to go with him to sell drugs, and, when complainant refused, he grew angrier still. Defendant followed complainant around the apartment. She testified that she believed that defendant would kill her or hurt her if she tried to leave. Complainant did not believe that she was going to get out alive. However, when the police arrived, presumably in response to an unidentified call, complainant was able to leave. The police then entered the apartment and arrested defendant. Defendant was released from jail at 5:25 p.m. the next day and was pounding on complainant's apartment door within minutes. The police arrived in response to her 9-1-1 call. They spoke to defendant but did not arrest him. That evening defendant called complainant repeatedly and watched her apartment. When complainant went to the store, defendant followed.

When he threatened to make her life "ugly" unless she dropped the restraining order, complainant notified store security that defendant was violating a restraining order. Defendant left.

Defendant's conduct from January 26 to May 12, 1997 resulted in his indictment on eight counts: four counts of coercion, ORS 163.275, two counts of assault in the fourth degree, ORS 163.160, and one count each of menacing, ORS 163.190, and harassment, ORS 166.065. The jury convicted defendant on each count. He was then sentenced consecutively on the four coercion counts to 126 months (with 36 months of post-prison supervision), and concurrently on the remaining counts.

Only the convictions for coercion are at issue here. Defendant makes numerous assignments of error regarding those convictions.[2] However, we limit our review to the relevance of the expert's testimony concerning BWS and the so-called "lethality assessment."

The state offered expert testimony regarding the behavior of women in abusive relationships to rebut defendant's challenge to complainant's credibility. At trial, defendant contended that complainant's testimony regarding his abusive conduct was belied by her own behavior. Specifically, complainant continued to have sexual relations with defendant and to meet with him socially throughout the period encompassing the conduct for which he is charged. Because, in defendant's view, no one would remain in a relationship as abusive as the one described by complainant, evidence that she continued to see him suggests that she was not truthful about his conduct during that same period.

In a brief examination, out of the jury's presence, the state summarized its offer of expert testimony:

"[The expert is] not going to be testifying with regard to this particular victim and rendering an opinion as to whether or not she's a battered woman but rather educating the jury

---

[2] We affirm the trial court's denial of defendant's demurrer and his motion for judgment of acquittal without further discussion. Similarly, we find no error in the trial court's instructions to the jury.

with regard to behaviors of people in general in domestic violence relationships or in battering relationships."

In other words, the expert's testimony was not offered to show that complainant suffered from BWS; rather, it was offered to buttress complainant's credibility by providing an alternative explanation for her behavior.

Defendant objected to the relevance of the state's proffered testimony:

"And as far as this case, I believe that I'm going to object on relevancy grounds that generalized statements about certain things have no bearing on this case at all as far as battered women and anything else and what they're typical to do because there's no foundation being that this is a battered woman at all.

"There's no interview with this woman to decide whether she meets the qualifications of a battered women syndrome, whatever this particular expert might feel that particular term is defined. And without that foundation, I don't believe that she can make that statement."

The court ruled that the evidence was "highly relevant." The expert then testified before the jury about how abusive men control women using a combination of physical, emotional, verbal, and economic abuse, as well as about the effect such abuse can have on the woman's behavior.

The expert explained that domestic abuse should not be viewed as a series of discrete violent incidents but should be seen instead as a cycle of abuse with distinct phases. Specifically, a violent incident is often followed by a period of remorse, characterized by contrition, gifts, and promises to get help. During the next phase, referred to as the "honeymoon," things appear to improve. At some point, however, tension builds as the woman attempts to appease her abuser, trying to avoid a trigger, which inevitably gets tripped, resulting in another violent incident. The key to understanding this as a cycle, according to the expert, is to recognize that most abusers continue to employ the other forms of abuse— i.e., economic, verbal, and emotional—throughout the period between violent incidents. The common effect, according to the expert, is to break down a victim's self-esteem and resolve.

As an example of the effect abusive relationships have on victims' behavior, the witness identified factors in addition to low self-esteem that are commonly used by experts to explain why women who have fallen under the control of abusive men remain in the relationship instead of simply leaving. Such factors include: the woman's commitment to the relationship and her hope for change, the impact or threat to children in the household, economic dependence, the presence of a support network, or, conversely, the degree of isolation from family and friends, and, finally, the apparent danger of leaving.

■ On appeal, defendant argues that evidence about BWS is irrelevant because the state did not establish that complainant suffers from the syndrome. The state points out that OEC 401 establishes a very low threshold for admission of evidence. *State v. Titus*, 328 Or 475, 481, 982 P2d 1133 (1999). OEC 401 provides:

> " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

Specifically, the state argues that evidence is relevant if it affects the balance of probabilities to any degree. *State v. Gailey*, 301 Or 563, 567, 725 P2d 328 (1986). At issue here is complainant's credibility. According to the state, evidence about the behavior of battered women is relevant because it bolsters complainant's credibility by explaining why she remained in an abusive relationship, a relationship that many people would expect her to leave. We agree with the state that, in a case such as this, evidence regarding BWS could be highly relevant. However, at trial, the state failed to establish a critical link between the expert's testimony about why a battered woman might choose to remain in an abusive relationship and why this complainant did so. Specifically, the state did not establish that complainant suffers from BWS. If complainant does not suffer from BWS, then testimony about that subject seemingly has no bearing on complainant's behavior.

The state nevertheless argues that no diagnosis of complainant was necessary and that, even if it was, the failure to do so did not prejudice defendant. We understand the state's argument to be that a jury may decide how to use the expert's BWS testimony without the benefit of a diagnosis or, failing that, any error in admitting the testimony was harmless. We disagree.

We have previously accepted the following definition of BWS:

> "[A] *psychological diagnosis* that refers to a collection or pattern of characteristics coupled by abuse which may be physical, psychological, sexual, or social, or all of those kinds of abuse, occurring over a period of time, usually repeatedly." *State v. Stevens*, 147 Or App 592, 598, 938 P2d 780 (1997), *rev'd in part, aff'd in part* 328 Or 116 (1998) (emphasis added).

Stated more simply, BWS *is* a diagnosis, used to explain various characteristics, including behavior or reactions. Here, the state offered expert testimony *about* BWS to assist the jury in understanding the behavior of "people in general" in battering relationships. However, general information about BWS is not sufficient to explain why *this* complainant elected to remain in an abusive relationship.

Implicit in the state's argument is the idea that the jury, having heard evidence of abuse and expert testimony about BWS, can reasonably deduce that complainant behaved as a battered woman. In other words, the jury can diagnose BWS. We reject that proposition. A diagnosis of BWS is scientific evidence that requires expert testimony. *State v. Trager*, 158 Or App 399, 403, 974 P2d 750, *rev den* 329 Or 358 (1999) ("[E]vidence of typical reactions is syndrome evidence that draws its convincing force from some scientific principle or empirical data."). Typically, the jury is free to accept or reject an expert's diagnosis; but we hold that the diagnosis—in this case, that complainant suffers from BWS—is a predicate to the admissibility of evidence about BWS and behavior attributable to BWS.

In a separate assignment, defendant argues that it was error for the court to admit testimony from the same expert about the "lethality assessment," a statistical model

that suggests that battered women are more likely to be killed after they leave an abusive relationship than while they are in the relationship. According to defendant, the lethality assessment is relevant only to the issue of complainant's credibility—*i.e.*, why she continued to see defendant—if she knew about the assessment. We do not consider that argument because, on this record, testimony about the lethality assessment suffers from the same lack of relevancy as the rest of the expert's BWS testimony—it presupposes that complainant is a battered woman. As previously discussed, if complainant is not a battered woman, evidence about the behavior of battered women, including the lethality assessment, is not relevant.

■ Finally, we consider the state's argument that the trial court's error was harmless. The concern with respect to expert testimony is that juries tend to afford such evidence undue weight, or, as the Supreme Court said in *State v. Brown*, 297 Or 404, 440, 687 P2d 751 (1984), "scientific evidence must not 'assume a posture of mystic infallibility in the eyes of a jury of lay[persons].'" (Quoting *United States v. Addison*, 498 F2d 741, 744 (DC Cir 1974)); *see also State v. Nulph*, 31 Or App 1155, 1159, 572 P2d 642 (1977), *rev den* 282 Or 189 (1978); Laird C. Kirkpatrick, *Oregon Evidence*, 434 (3rd ed 1996). Here, in arguing its case to the jury, the state relied heavily on the expert's testimony, using it not only to bolster complainant's credibility by explaining why she continued to see defendant but also as a framework for analyzing most of the evidence adduced at trial. Given that we find the expert's testimony irrelevant, we cannot say that it did not influence the jury unduly. The trial court's error was not harmless.

Reversed and remanded.